**Alejandro GUTIERREZ, Plaintiff,**

v.

**CITY OF WENATCHEE, Defendant.**

**No. C-87-283-RJM.**

United States District Court,
E.D. Washington.

June 12, 1987.

Richard Montoya, East Wenatchee, Wash., for plaintiff.

Tony DiTommaso, Carlson & Drewelow, Wenatchee, Wash., for defendant.

## ORDER

ROBERT J. McNICHOLS, Chief Judge.

A temporary restraining order was issued on May 8, 1987 prohibiting the City of Wenatchee from incarcerating Mr. Gutierrez solely on the basis of his alleged status as an illegal alien. Hearing on the merits was held on May 18, 1987 and the following undisputed facts emerged.

Plaintiff, an undocumented Mexican national, was charged with several misdemeanors in April and August of 1986 in Chelan County District Court. Each resulted in a plea bargain. Sentencing contemplated a probationary period during which he would not break any laws, nor would he return to Chelan County while in an undocumented status. In mid-August of 1986, Mr. Gutierrez took a voluntary departure in lieu of deportation. Predictably enough, plaintiff's return to his homeland amounted to little more than a U-turn and he was back in the Wenatchee area within the week.

Plaintiff's presence was not discovered until March of 1987 when several INS agents detained him. Because of the intervening enactment of the Immigration Reform and Control Act of 1986 (P.L. 99–603), the agents could not hold him. 8 U.S.C. § 1255a(e)(1). However, they did approach the Wenatchee City Attorney and provide him with affidavits setting forth their conclusion that plaintiff was in the country illegally. Based on this information, the City Attorney petitioned the District Court for revocation of probation. The only grounds alleged were that Mr. Gutierrez had "violated the law by returning to the United States illegally." After a hearing, the District Court ordered revocation, relying solely on the INS agents' affidavits, and holding the 1986 Act irrelevant.

### The Immigration Reform and Control Act of 1986:

No one really knows how many aliens have slipped across the nation's borders and are currently living in an undocumented nether world. See *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975) (perhaps as many as twelve million). The dislocation created by this influx is graphically described in *United States v. Baca*, 368 F.Supp. 398, 402 *et seq.* (S.D.Cal.1973). The one thing which has become certain over the years is that illegal immigration is a social malady, and not a legal problem to be addressed under the guise of traditional criminal and quasi-criminal proceedings. *United States v. Ortiz*, 422 U.S. 891, 915, 95 S.Ct. 2585, 2597, 45 L.Ed.2d 623 (1975) (White, J., concurring and calling for employer sanctions). After years of legislative paralysis, Congress has finally evinced the political courage to tackle directly the cause and effect of unlawful entry by enacting the Immigration Reform and Control Act of 1986. Among the provisions pertinent to the instant action are the following.

Legitimization of residency will be available to those illegals who:

> entered the United States before January 1, 1982 and [have] resided continuously in the United States since such date and through the date the application is filed under this subsection.

8 U.S.C. § 1255a(a)(2)(A).

Additionally, the alien must establish that he "has been continuously physically present in the United States since November 6, 1986." Section 1255a(b)(3)(A).

"Continuous physical presence" is not broken by "brief, casual, and innocent absences." Section 1255a(b)(3)(B). Mr. Gutierrez's immediate re-entry after his sojourn to Mexico in August of 1986 was thus not only a serendipitous move on his part, but a necessary one if he were to enjoy the benefits of the Act.

It may at first glance appear unseemly, if not perverse, that Congress would not only countenance but require unlawful entry, but there is no other way the statute can be read. It bears noting in this regard that while persons in plaintiff's position may be technically guilty of illegal conduct in surreptitiously re-entering, Congress has taken away the executive branch's ability to punish such conduct during the pendency of administrative proceedings determining entitlement to amnesty. Section 1255a(e). It also bears noting that Congress had some rather definite goals in mind in comprehensively addressing the massive problem of illegal immigration, and that for every illegal alien rewarded for his longevity as such, another will be shut out by economic reality. Congress so intended:

> This legislation seeks to close the back door on illegal immigration so that the front door on legal immigration may remain open. The principal means of closing the back door, or curtailing future illegal immigration, is through employer sanctions. The bill would prohibit the employment of aliens who are unauthorized to work in the United States because they either entered the country illegally, or are in an immigration status which does not permit employment. U.S. employers who violate this prohibition would be subject to civil and criminal penalties.
>
> Employment is the magnet that attracts aliens here illegally or, in the case of nonimmigrants, leads them to accept employment in violation of their status. Employers will be deterred by the penalties in this legislation from hiring unauthorized aliens and this, in turn, will deter aliens from entering illegally or violating their status in search of employment.

The logic of this approach has been recognized and backed by the past four administrations, and by the Select Commission on Immigration and Refugee Policy. Legislation establishing employer sanctions passed the House of Representatives by overwhelming majorities in 1972 and 1973, but received no Senate action.

Now, as in the past, the Committee remains convinced that legislation containing employer sanctions is the most humane, credible and effective way to respond to the large-scale influx of undocumented aliens. While there is no doubt that many who enter illegally do so for the best of motives—to seek a better life for themselves and their families—immigration must proceed in a legal, orderly and regulated fashion. As a sovereign nation, we must secure our borders.

H.Rep. No. 99–682(I) at 46, *reprinted in,* [1986] U.S.Code Cong. & Ad. News 5649, 5650.

The net result is that Congress, after a prolonged hiatus in the face of an ever-growing national emergency, finally acted decisively, and some might say radically, in attempting to effectuate solutions to both the existing dilemma and the question of future enforcement. Not everyone can be expected to agree with the legislative generosity extended to persons in Mr. Gutierrez's position, but few would quarrel with Congress's authority to adopt the approach it did. Plaintiff should not be forced to invoke his federal rights under the Act only at the expense of doing time in state custody.

This is more than an abstraction. Those who would benefit under the Act cannot come before the INS and have their word taken at face value that they have resided continuously in the United States since January 1, 1982. Rather:

> The Attorney General shall require that—
>
> (i) continuous residence and physical presence in the United States must be established through documents, together

with independent corroboration of the information contained in such documents, and

(ii) the documents provided under clause (i) be employment-related if employment-related documents with respect to the alien are available to the applicant.

8 U.S.C. § 1255a(g)(2)(D).

The record does not reflect the total length of time during which Mr. Gutierrez resided in the Wenatchee area, but it is certain that the period runs from at least April of 1986 forward. It would be intolerable were he required to collect documentation and corroborative evidence relating to his employment, residence, and criminal history in Wenatchee while at the same time skirting contact with the local gendarmes.[1]

*Determination of Alienage:*

Beyond the impact of the 1986 legislation, there is a more basic reason why plaintiff must prevail. It has now been an unchallenged article of faith for some one hundred years that "[t]he authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government." *Truax v. Raich,* 239 U.S. 33, 42, 36 S.Ct. 7, 11, 60 L.Ed. 131 (1915) and authorities cited therein. The extent to which the states may regulate, tax, control, and otherwise exercise functions of residual sovereignty over aliens has been an oft-debated topic; the most recent example of which emanating from the Supreme Court being *Toll v. Moreno,* 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982). While the majority and dissent visit the outer limits of collegiality in expressing their respective views, neither questions for a moment the fundamental truism of *Truax*

that it is the federal government, and not the states, which is constitutionally and historically charged with exclusive responsibility over the core question of who is and who is not eligible for entry into the United States. *Compare Toll, supra,* 458 U.S. at 10–11, 102 S.Ct. at 2982 *with id.* at 26–27, 102 S.Ct. at 2990–91 (Rehnquist, J., dissenting).

The net result is that to the extent Mr. Gutierrez has broken a law at all in returning to this country, he is in violation of federal law only. This Court has no concern with a state or its political subdivision imposing as a condition of probation the requirement that one not break any law, state or federal. However, there is a great deal of concern when a state court makes a factual determination and reaches a legal conclusion that a federal law has been broken. There is simply no jurisdictional authority for it to do so. 18 U.S.C. § 3231[2]

*Abstention:*

The Court has considered the wisdom of abstaining under the *Younger* Doctrine. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). It is well-established under that decision and its progeny that federal courts will rarely intervene in ongoing state criminal proceedings. *See generally, Fresh Intern. v. Agricultural Labor Relations Bd.,* 805 F.2d 1353, 1356–57 (9th Cir.1986) and authorities cited therein. Even a clear violation of an accused's federal constitutional rights will not necessarily justify such intervention, the theory being that: (1) state courts are every bit as competent to weigh constitutional issues as are federal courts; and (2) the federal issue will ultimately be appeal-

---

1. This is said only half facetiously. Mr. Gutierrez's involvement with the criminal system would in fact be probative of his continuous physical presence.

2. That statute provides:

The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof.

This is nothing more than a codification of the federalism which prevents the national government from impinging upon the sovereignty of the States, and vice versa. *See generally, Tennessee v. Davis,* 100 U.S. (10 Otto) 257, 25 L.Ed. 648 (1880). Interestingly enough, the leading case construing § 3231 in modern times was decided by a Washington State court. *State v. Tidwell,* 32 Wash.App. 971, 973–77, 651 P.2d 228 (1982).

able directly to the U.S. Supreme Court, or collaterally through the habeas process.

While the Court recognizes, subscribes to, and is bound by the *Younger* principles, it is noteworthy that the underpinnings of that decision are grounded in concepts of comity. It is unlikely that comity would be served by abstaining under circumstances such as extant here where the State has no jurisdiction to proceed. Perhaps more to the point, the clear lack of subject-matter jurisdiction vitiates the State's interest in this matter:

> [A]bstention is appropriate in favor of a state proceeding if (1) the state proceedings are ongoing; (2) the proceedings implicate important state interests; and (3) the state proceedings provide an adequate opportunity to raise federal questions.

*Fresh Intern., supra*, 805 F.2d at 1357–58 (citation omitted).

*Conclusion:*

Federal jurisdiction over questions of alienage is exclusive. Congress has recently undertaken a comprehensive reorganization of the manner in which existing illegals are to be handled. Any interference by the states with either that congressional mandate or with the rights of individuals covered thereunder cannot be condoned. The Court finds it unnecessary to enter the quagmire of plaintiff's proffered equal protection argument which seeks relief on the basis that Mr. Gutierrez has been treated differently by reason of his alienage than would be a citizen. It is enough to reach the question of whether the State has the power to determine alienage. It does not.[3]

THEREFORE IT IS ORDERED that:

(1) On the theory that no State officer would act in contravention of a declaratory judgment, the Court declines to enter the permanent injunction sought by plaintiff. *Cf., Spokane Arcades v. Ray*, 449 F.Supp. 1145, 1158 (E.D.Wash.1978), *aff'd sub nom.*

*Spokane Arcades v. Brockett*, 631 F.2d 135 (9th Cir.1980), *aff'd* 454 U.S. 1022, 102 S.Ct. 557, 70 L.Ed.2d 468 (1981).[4]

(2) By way of declaratory relief, the Court concludes that whether or not Mr. Gutierrez is in the United States illegally is wholly a question of federal law to be determined either under appropriate administrative proceedings, or in the context of a prosecution under Title 8, U.S.C.

(3) The Clerk shall enter judgment accordingly.

---

**3.** The City argues that the instant action is an attempt to impair the plea bargain freely entered into by plaintiff. This is not the case. Mr. Gutierrez has agreed to refrain from violating the law as a condition of probation. Nothing herein relieves him of that obligation.

Should he break the law, he will be fully liable to revocation and incarceration. All this disposition determines is that a state court lacks authority to ascertain plaintiff's alienage status.

**4.** *Cf., Fresh Intern., supra*, 805 F.2d at 1356 n. 1.