[No. S158043. Jan. 22, 2009.]

In re JOSE C., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
JOSE C., Defendant and Appellant.

## COUNSEL

Kurt David Hermansen, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lise Jacobsen and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—Welfare and Institutions Code section 602 purports to give our state courts jurisdiction to declare any juvenile who "violates any law . . . of the United States" a ward of the court. (*Id.*, subd. (a).) However, Congress has granted federal courts "original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." (18 U.S.C. § 3231.) We consider whether, under the United States Constitution's supremacy clause, section 3231 or any other provision of federal law preempts Welfare and Institutions Code section 602.

■ We conclude Welfare and Institutions Code section 602 is not preempted. While Congress has barred state courts from entertaining direct criminal prosecutions of federal violations, close analysis of the federal statutes allocating jurisdiction demonstrates Congress did not intend to preclude state courts from adjudicating whether federal law has been violated

in the context of state delinquency proceedings. Such proceedings exist, separate and apart from the adult criminal justice system, out of a recognition that minors who commit criminal offenses pose a special problem and require treatment and rehabilitation different from the confinement and punishment meted out in adult criminal trials. Whether delinquency proceedings are treated as civil or criminal, the determinations they entail—whether a minor should be declared a ward of the court and what juvenile treatment and rehabilitation he or she should be afforded—do not trench on exclusive federal court prerogatives to try, convict, and punish for the violation of federal law. To the contrary, Congress, recognizing no comparable federal system exists, has made clear its preference that offenses by minors be handled, whenever possible, by state juvenile courts. As an independent sovereign, California generally may exercise its police power to regulate such juvenile misconduct, even when that misconduct is simultaneously the subject of federal prohibitions.

Nor is the present proceeding, which involves the alleged violation of federal immigration law, preempted by exclusive federal authority over matters pertaining to immigration. While it is well settled that only the federal government may regulate the border and establish rules governing who may enter and who may stay, equally clear is that Congress has in its immigration enactments embraced a model of collaborative federalism under which states and localities may assist in the enforcement of federal immigration policy. Welfare and Institutions Code section 602, insofar as it authorizes state courts to address juvenile violations of the immigration laws, does just that.

We will affirm the Court of Appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

On August 16, 2006, United States Border Patrol agents tracked footprints leading across the Mexican border into the California desert near Calexico. A border patrol agent in a helicopter saw several persons hiding in bushes. One of these persons, later identified as Jose C., motioned to the other individuals to follow him. When agents approached the group on foot, he broke off and hid an item under a bush. After detaining Jose C. and six other persons, an agent recovered a cell phone hidden under the bush. The federal agents arrested Jose C., a minor, and transferred him to state custody.

The Imperial County District Attorney thereafter filed a juvenile wardship petition under Welfare and Institutions Code section 602, alleging a single count of illegally bringing six aliens into the United States without presentation at the border, in violation of title 8 United States Code section

1324(a)(2)(B)(iii). At the outset of the jurisdictional hearing, Jose C.'s counsel objected that the juvenile court lacked jurisdiction to adjudicate federal criminal violations. The juvenile court overruled the objection, relying on the portion of Welfare and Institutions Code section 602 that purports to give state courts authority to base wardships on violations of federal law.

At trial, two of the persons who had been detained with Jose C. testified they had made arrangements with undisclosed parties for assistance in crossing into the United States and had agreed to pay $1,800 once safely inside the country. They further testified that Jose C. had acted as their guide during the crossing. Jose C. told them when to move, swept their footprints to remove their tracks, and repeatedly spoke on a cell phone, apparently in an attempt to determine when immigration agents were in the vicinity. Based on this evidence, the court found the allegations in the petition true beyond a reasonable doubt and declared Jose C. a ward of the court. At the dispositional hearing, the court declared the offense a felony, set the maximum term of confinement at 10 years, gave Jose C. credit for 58 days served in juvenile hall, and placed him on formal probation.

The Court of Appeal affirmed. It rejected Jose C.'s argument that the juvenile court lacked jurisdiction, reasoning that whether or not title 18 United States Code section 3231 deprived state courts of jurisdiction was irrelevant because title 18 United States Code section 5032 (a statute governing delinquency proceedings in federal court) displaced section 3231 with regard to juvenile matters, a presumption of concurrent jurisdiction applied, and section 5032 made no mention of depriving state courts of jurisdiction.

We granted review to resolve a significant federalism question: whether under Welfare and Institutions Code section 602 a state court has jurisdiction to declare a juvenile a ward of the court based on violations of federal law.

DISCUSSION

### I. *Jurisdictional Preemption*

#### A. *Title 18 United States Code Section 3231*

Welfare and Institutions Code section 602, subdivision (a) provides in relevant part: "[A]ny person who is under the age of 18 years when he or she violates any law of this state *or of the United States* or any ordinance of any city or county of this state defining crime . . . is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court." (Italics added.) Thus, as a matter of state law, the Legislature has granted

juvenile courts the authority to declare juveniles wards of the court on the basis of acts that violate state *or* federal criminal law.

Jose C. contends this jurisdictional grant is necessary but not sufficient; that under the supremacy clause (U.S. Const., art. VI, cl. 2), state court jurisdiction depends as well on whether Congress has withdrawn from state courts the power to exercise jurisdiction. As a constitutional matter, it has long been settled that Congress has the power to constrict state court jurisdiction, at least with respect to federal matters. (*Howlett v. Rose* (1990) 496 U.S. 356, 368, fn. 15 [110 L.Ed.2d 332, 110 S.Ct. 2430]; *Claflin v. Houseman, Assignee* (1876) 93 U.S. 130, 137 [23 L.Ed. 833]; *The Moses Taylor* (1866) 71 U.S. 411, 429–430 [18 L.Ed. 397]; *Martin v. Hunter's Lessee* (1816) 14 U.S. 304, 337 [4 L.Ed. 97].) Relying on title 18 United States Code section 3231 (hereafter section 3231), Jose C. argues that Congress has done so here and thereby expressly preempted the instant proceeding.

The first sentence of section 3231 provides: "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." This portion of the statute establishes two general principles: first, federal district courts may exercise jurisdiction over federal criminal offenses, and second, state courts may not do so. At a minimum, therefore, section 3231 displaces state court jurisdiction over the direct prosecution, conviction, and imposition of federal criminal punishment for violations of federal criminal statutes. Jose C. contends section 3231 goes further and precludes state courts from interpreting and adjudicating in any proceeding whether a federal criminal statute has been violated.

In contesting whether the language of the statute bars adjudication of federal criminal conduct in the context of a state wardship petition, the People and Jose C. debate at length whether a state wardship petition gives rise to a "civil" or "criminal" proceeding. Wardship proceedings have at different times, and for different purposes, been characterized as de facto criminal (e.g., *In re Gault* (1967) 387 U.S. 1, 27–31, 36–37 [18 L.Ed.2d 527, 87 S.Ct. 1428]; *In re Kevin S.* (2003) 113 Cal.App.4th 97, 108–109 [6 Cal.Rptr.3d 178]; *In re Gregory K.* (1980) 106 Cal.App.3d 164, 168 & fn. 2 [165 Cal.Rptr. 35]) and as genuinely civil (e.g., *In re Derrick B.* (2006) 39 Cal.4th 535, 540 [47 Cal.Rptr.3d 13, 139 P.3d 485]; *People v. Sanchez* (1985) 170 Cal.App.3d 216, 218 [216 Cal.Rptr. 21]; Welf. & Inst. Code, § 203). In truth, they are hybrid proceedings, and the question whether a wardship proceeding is de facto criminal or civil has no single answer; rather, it depends on the purpose for which the question is asked. Here, faced with a preemption question, we conclude the precise characterization is immaterial because, whether characterized as civil or criminal, wardship proceedings that

determine whether a federal criminal statute has been violated are not preempted by section 3231.

### B. *Welfare and Institutions Code Section 602 as a Civil Proceeding*

Taking first the view that wardship proceedings are properly characterized as civil, we follow the United States Supreme Court's lead in *Tafflin v. Levitt* (1990) 493 U.S. 455 [107 L.Ed.2d 887, 110 S.Ct. 792] and find no preemption. In *Tafflin*, the Supreme Court considered whether state courts have concurrent jurisdiction over civil violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. §§ 1961–1968). Civil RICO is an unusual statute, in that a civil RICO claim may depend upon proof that one of an enumerated list of federal criminal laws has been violated. (*Id.*, §§ 1961(1), 1962, 1964(c); *Cianci v. Superior Court* (1985) 40 Cal.3d 903, 909 [221 Cal.Rptr. 575, 710 P.2d 375].) Thus, to adjudicate whether a civil RICO claim has been established, a court or jury may need to determine whether a federal criminal violation has occurred. The *Tafflin* plaintiffs, arguing for exclusive federal court jurisdiction over such claims, contended permitting a state court to make this predicate determination would violate section 3231's grant of exclusive federal criminal jurisdiction and thus be incompatible with federal interests.

The United States Supreme Court found no incompatibility. "[C]oncurrent jurisdiction over [18 U.S.C.] § 1964(c) suits," it explained, "is clearly not incompatible with § 3231 itself, for civil RICO claims are not 'offenses against the laws of the United States,' § 3231, and do not result in the imposition of criminal sanctions—uniform or otherwise." (*Tafflin v. Levitt, supra,* 493 U.S. at p. 464.) It went on to conclude that state courts interpreting and applying federal criminal law posed no threat to federal interests, as state courts would be bound by federal precedent and their interpretations would be subject to direct review in the United States Supreme Court. (*Id.* at pp. 465–466; see also *id.* at p. 468 (conc. opn. of White, J.) [opining that federal misapplication of state law under RICO posed greater risk than the reverse].) The *Tafflin* court asserted its "full faith in the ability of state courts to handle the complexities of civil RICO actions" (*Tafflin,* at p. 465) and declined to "denigrate the respect accorded coequal sovereigns" by concluding jurisdiction must be withheld (*id.* at p. 466).

In short, though a civil proceeding such as civil RICO may require adjudication of whether a federal criminal law has been violated, that determination does not of itself convert the civil proceeding into an "offense[]" subject to the exclusive jurisdictional bar of section 3231. Rather, *Tafflin* makes clear, a proceeding involves adjudication of an offense only if,

at a minimum, it also involves "the imposition of criminal sanctions." (*Tafflin v. Levitt, supra,* 493 U.S. at p. 464.) Assuming, as we do at present, that a state wardship proceeding involves only civil sanctions and is, like civil RICO, "primarily remedial rather than punitive" (*Tafflin,* at p. 464; see *In re Charles C.* (1991) 232 Cal.App.3d 952, 955 [284 Cal.Rptr. 4]), the identical reasoning applied here demonstrates that adjudication of federal criminal violations in the course of a state wardship proceeding does not convert those proceedings into "offenses" and render jurisdiction preempted by section 3231.[1]

### C. *Welfare and Institutions Code Section 602 as a Criminal Proceeding*

We now consider the contrary characterization, that for purposes of preemption under title 18 United States Code section 3231, a state wardship proceeding under Welfare and Institutions Code section 602 is properly viewed as fundamentally criminal. This characterization changes our reasoning, but not our conclusion that section 3231 does not preempt state wardship proceedings.

First, it has always been understood that the several states are independent sovereigns possessing inherent police power to criminally punish conduct inimical to the public welfare, even when that same conduct is also prohibited under federal law.[2] "The Constitution leaves in the possession of

---

[1] Similarly, in the context of probation revocation hearings triggered by further criminal conduct, our Courts of Appeal have correctly recognized that a state court may adjudicate the predicate question whether a violation of federal law has been committed. (*People v. Beaudrie* (1983) 147 Cal.App.3d 686, 691 [195 Cal.Rptr. 289]; see *Gulf Offshore Co. v. Mobil Oil Corp.* (1981) 453 U.S. 473, 483, fn. 12 [69 L.Ed.2d 784, 101 S.Ct. 2870] ["exclusive federal jurisdiction will not prevent a state court from deciding a federal question collaterally even if it would not have subject-matter jurisdiction over a case raising the question directly"].)

[2] See *Westfall v. United States* (1927) 274 U.S. 256, 258 [71 L.Ed. 1036, 47 S.Ct. 629] (opn. of Holmes, J.) ("Of course an act may be criminal under the laws of both [state and federal] jurisdictions."); *Crossley v. California* (1898) 168 U.S. 640, 641 [42 L.Ed. 610, 18 S.Ct. 242] ("[I]t is settled law that the same act may constitute an offence against the United States and against a State, subjecting the guilty party to punishment under the laws of each government . . . ."); *People v. Morante* (1999) 20 Cal.4th 403, 426 [84 Cal.Rptr.2d 665, 975 P.2d 1071]; Penal Code section 655; see generally Kurland, *First Principles of American Federalism and the Nature of Federal Criminal Jurisdiction* (1996) 45 Emory L.J. 1, 82–90 (discussing historical evidence that overlapping state and federal criminal subject-matter jurisdiction was contemplated from the time of the Federal Convention of 1787).

There are limits to this principle; Congress may, if it so chooses, preempt state criminal regulation of particular acts. (See *Pennsylvania v. Nelson* (1956) 350 U.S. 497, 502 [100 L.Ed. 640, 76 S.Ct. 477] [concluding Congress had occupied the field with respect to sedition against the federal government, and a state criminal statute punishing the same act was preempted]; *Houston v. Moore* (1820) 18 U.S. 1, 21–24 [5 L.Ed. 19] (lead opn. of Washington, J.) [concluding state court martial law was preempted insofar as it purported to regulate a field

each State 'certain exclusive and very important portions of sovereign power.' " (*Heath v. Alabama* (1985) 474 U.S. 82, 93 [88 L.Ed.2d 387, 106 S.Ct. 433], quoting Hamilton, The Federalist No. 9 (Cooke ed. 1961) p. 55.) "Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code." (*Heath*, at p. 93.) This understanding is at the root of the dual sovereignty exception to the United States Constitution's double jeopardy clause, which recognizes that because individual states and the United States are "two sovereignties, deriving power from different sources, capable of dealing with the same subject-matter within the same territory," each may punish the same act without offending double jeopardy principles. (*United States v. Lanza* (1922) 260 U.S. 377, 382 [67 L.Ed. 314, 43 S.Ct. 141].)[3] Thus, Congress may pass a law barring a particular act and imposing a specific punishment, and a state legislature may pass a state law barring the same act and imposing a different specific punishment, as well as vesting jurisdiction over violations of the state law in its state courts, without encroaching upon the exclusive jurisdiction of the federal courts to adjudicate violations of the federal law and impose the federal punishment.[4]

█ Section 3231 embraces these settled principles. It provides in its second sentence: "Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States *under the laws thereof.*" (Italics added.) Thus, while the section grants federal courts exclusive jurisdiction over the *prosecution* of federal offenses, it does not do so over the *punishment* of acts criminalized by federal law; to the extent state law also establishes sanctions for those acts, state courts retain jurisdiction under their own state laws to hear cases and impose punishment. (See *In re Dixon* (1953) 41 Cal.2d 756, 764 [264 P.2d 513].)[5]

---

Congress had occupied].) These limits are substantive, not jurisdictional, and relate only to whether a state legislature can punish given conduct. We deal with substantive preemption questions in part II.B., *post.*

[3] See also *Department of Revenue of Mont. v. Kurth Ranch* (1994) 511 U.S. 767, 782, footnote 22 [128 L.Ed.2d 767, 114 S.Ct. 1937]; *Heath v. Alabama, supra,* 474 U.S. at pages 88–90; *Abbate v. United States* (1959) 359 U.S. 187, 194–195 [3 L.Ed.2d 729, 79 S.Ct. 666]; *Bartkus v. Illinois* (1959) 359 U.S. 121, 128–129 [3 L.Ed.2d 684, 79 S.Ct. 676]; *People v. Comingore* (1977) 20 Cal.3d 142, 145 [141 Cal.Rptr. 542, 570 P.2d 723]; *People v. Belcher* (1974) 11 Cal.3d 91, 96–97 [113 Cal.Rptr. 1, 520 P.2d 385].

[4] This is what we meant when we explained long ago that "[s]tate tribunals have no power to punish crimes against the laws of the United States, *as such.* The same act may, in some instances, be an offense against the laws of both, and it is only as an offense against the State laws that it can be punished by the State, in any event." (*People v. Kelly* (1869) 38 Cal. 145, 150.)

[5] At oral argument, Jose C. contended this second sentence relates only to preservation of state jurisdiction in civil matters. Nothing in the structure of the sentence suggests such a limitation. To the contrary, its placement in title 18 of the United States Code, governing

Second, whether a state legislature exercises its sovereign power to impose independent state criminal punishment for an act by writing its own statute prohibiting it, or by writing a statute incorporating an existing federal criminal prohibition, is immaterial. The distinction is a purely formal one. A state or territory that elects to incorporate portions of federal criminal law into its own criminal code may establish state jurisdiction to try violations as state crimes without offending section 3231. (*U.S. v. Lee* (9th Cir. 2006) 472 F.3d 638, 642–643; cf. *People v. Tilehkooh* (2003) 113 Cal.App.4th 1433, 1446 [7 Cal.Rptr.3d 226] [acknowledging that while a state cannot directly enforce federal criminal law, it can "reach conduct subject to the federal criminal law by incorporating the conduct into the state law"].)[6]

■ This is, in essence, what Welfare and Institutions Code section 602 does. It incorporates by reference federal criminal law, rendering it a basis for the imposition of independent state sanctions, and grants state courts authority to adjudicate such matters. It recognizes the independent state interest in rehabilitating juveniles within this state who are unable to conform their conduct to the requirements of the law—whether that law be local ordinance, state statute, or federal enactment.[7] Section 3231 does not deprive state courts of jurisdiction granted under their own state laws to impose independent state sanctions.

Jose C. objects that under this interpretation of section 3231, states may augment federal criminal statutes in any way they please, adding on various civil or criminal piggyback remedies or sanctions that might conflict with federal dictates. But whether Congress has preempted state court *jurisdiction* is not to be confused with whether it has preempted state *legislative action*. The former involves only the question whether a state court has the power to entertain a particular cause; the latter involves the further question whether a state may enact substantive legislation governing the subject matter of the particular cause. (See *Houston v. Moore, supra*, 18 U.S. at pp. 24–25 [drawing the identical distinction in the course of concluding that state regulation, but not state jurisdiction, was preempted].) Section 3231, as interpreted in *Tafflin v. Levitt, supra*, 493 U.S. 455, does not preempt

criminal matters, belies such an interpretation, and in *In re Dixon, supra*, 41 Cal.2d at page 764, we expressly read this portion of section 3231 as preserving state criminal jurisdiction.

[6] Arguing against the power of states to regulate that which the federal government has proscribed criminally, Jose C. cites *People v. Zacarias* (2007) 157 Cal.App.4th 652, 660 [69 Cal.Rptr.3d 81], which held Penal Code section 182 (conspiracy) punishes only agreements to commit crimes under California, not federal, law. But *Zacarias* was a statutory interpretation case and concluded only that the Legislature had not chosen to punish conspiracies to commit federal crimes, not that it could not.

[7] See, e.g., *In re Charles C., supra*, 232 Cal.App.3d at page 955 ("While the aim of adult incarceration is punishment, a juvenile commitment is geared toward treatment and rehabilitation with the state providing substitute parental care for wayward youths during their minority." (Italics omitted.)).

*jurisdiction* over a proceeding that entails adjudication of the elements of an underlying federal criminal statute. Whether it preempts the substantive state enactment imposing an additional civil (or criminal) remedy—here, the authorization of state juvenile sanctions upon a finding a federal crime has been committed—is a discrete question we deal with separately below. (See pt. II.B., *post.*)

Jose C. also relies on two sister-state decisions that have addressed this issue and concluded section 3231 does in fact preempt state court jurisdiction. In *State v. Tidwell* (1982) 32 Wn.App. 971 [651 P.2d 228], a juvenile was convicted in state juvenile court of violating title 18 United States Code section 241, a federal civil rights statute, after burning a cross on an African-American family's lawn. The Washington Court of Appeals concluded the state court lacked jurisdiction, even in a juvenile proceeding, to determine whether someone had violated federal law. It reasoned that because section 3231 granted federal courts exclusive jurisdiction over federal offenses, it preempted the Washington statute granting state juvenile courts jurisdiction over violations of federal law. Violations of title 18 United States Code section 241 were offenses only against the federal sovereign and could not be punished by the state. Instead, the state court could consider only a state criminal trespass charge. (*Tidwell*, at pp. 230–232.) In *Matter of Welfare of J.J.T.* (Minn.Ct.App. 1997) 559 N.W.2d 714, 715–716, the Minnesota Court of Appeals followed *Tidwell* and without any independent reasoning concluded a state court could not declare a juvenile a delinquent based on a petition alleging federal criminal violations.

*State v. Tidwell, supra,* 651 P.2d 228, predates *Tafflin v. Levitt*'s determination that state courts are competent to decide whether a federal criminal law has been violated, section 3231 notwithstanding, if the proceeding is not itself a criminal prosecution. (*Tafflin v. Levitt, supra,* 493 U.S. at pp. 464–466.) It also fails to consider whether the Washington Legislature had made, or could make, offenses against federal sovereignty into matters of independent state concern by incorporating federal law into its state juvenile delinquency scheme. Accordingly, we do not find it persuasive.

■ In sum, whether characterized as civil or criminal, wardship proceedings that entail adjudication of whether a federal criminal statute has been violated are not expressly preempted by section 3231.[8]

---

[8] Because we so conclude, we need not reach the ground on which the Court of Appeal based its rejection of Jose C.'s section 3231 argument: that title 18 United States Code section 5032 supersedes section 3231 with respect to juvenile delinquency proceedings. As explained below, however, our interpretation of the effect of section 3231 on state juvenile proceedings has the salutary consequence of ensuring that state courts will remain open as forums in which to address juvenile conduct that runs afoul of federal criminal laws, an outcome Congress quite

## II. *Immigration Preemption*

We consider Jose C.'s alternative argument, that Congress has exclusive power to regulate immigration and state court adjudication of incorporated federal immigration offenses is preempted as an infringement of that power.

In the exercise of its powers, Congress may preempt state courts from exercising jurisdiction over immigration matters, or it may preempt state legislatures from substantively regulating on matters touching upon immigration. We address each possibility in turn.

### A. *Jurisdictional Preemption: Title 8 United States Code Section 1329*

■ Federal criminal laws relating to immigration are collected in title 8, chapter 12, subchapter II of the United States Code. Congress has granted federal courts jurisdiction over such matters: "The district courts of the United States shall have jurisdiction of all causes, civil and criminal, brought by the United States that arise under the provisions of this subchapter." (8 U.S.C. § 1329.) We think it clear Congress has not thereby preempted state court jurisdiction.

■ Title 8 United States Code section 1329 vests federal courts with jurisdiction but makes no mention of state courts. The absence of an express exclusion of state court jurisdiction "is strong, and arguably sufficient, evidence that Congress had no such intent." (*Yellow Freight System, Inc. v. Donnelly* (1990) 494 U.S. 820, 823 [108 L.Ed.2d 834, 110 S.Ct. 1566].) While in some cases preemption may be found in the absence of an explicit textual directive based on legislative history or demonstrated incompatibility with federal interests, we discern no such history or incompatibility here, and Jose C. identifies none. The consequence of state jurisdiction in the context of a wardship proceeding touching on immigration law is that state and federal courts may engage in parallel interpretation of the same statutes, but this concern has never alone been understood as sufficient to defeat jurisdiction. As the United States Supreme Court explained in *Tafflin v. Levitt, supra,* 493 U.S. at page 464, state interpretation of federal law, even federal criminal law, "creates no significant danger of inconsistent application" because federal courts are not bound by state interpretations, state courts are to be guided by existing federal interpretations, and any erroneous state court interpretations are subject to direct review in the United States Supreme Court.

---

clearly and expressly desired when it passed the Juvenile Justice and Delinquency Prevention Act of 1974 (18 U.S.C. §§ 5031–5042). (See *post,* pp. 554–555.)

Jose C. relies on *Gutierrez v. City of Wenatchee* (E.D.Wash. 1987) 662 F.Supp. 821, 824, for the proposition that state courts lack jurisdiction to decide whether a federal immigration law has been broken. While *Gutierrez* so holds, we are not persuaded.

In *Gutierrez*, an alleged illegal alien facing state incarceration following a probation revocation hearing sought an injunction in federal court. The terms of his probation forbade violation of any laws; at the probation revocation hearing, the state court purported to determine Gutierrez had violated federal immigration law. The federal district court issued a declaratory judgment, holding Gutierrez's immigration status could be decided only in the context of a federal prosecution or federal administrative proceeding. (*Gutierrez v. City of Wenatchee, supra*, 662 F.Supp. at pp. 822, 825.)

 *Gutierrez* rests, first, on the understanding that immigration may be regulated only by the federal government—a proposition we agree with in part, as discussed below, but which is not determinative—and second, on the understanding that under section 3231, state court adjudications of whether federal criminal laws have been violated impinge on federal sovereignty, even when the adjudication arises in the course of an independent state law proceeding (there, a probation revocation hearing). (See *Gutierrez v. City of Wenatchee, supra*, 662 F.Supp. at p. 824.) That latter understanding is incorrect, as the United States Supreme Court made clear a few years later in *Tafflin v. Levitt, supra*, 493 U.S. 455; contrary to *Gutierrez's* holding, section 3231 does not strip state courts of "jurisdictional authority" to "make[] a factual determination and reach[] a legal conclusion that a federal law has been broken" (*Gutierrez*, at p. 824). Accordingly, *Gutierrez* does not persuade us that state court jurisdiction is lacking here.[9]

B. *Substantive Preemption: Title 8 United States Code Section 1324*

1. *Preemption principles*

 Finally, we consider whether, though state court jurisdiction exists, Congress has preempted states from substantively regulating immigration matters, and in particular alien smuggling. That is, though Welfare and Institutions Code section 602 is valid insofar as it vests state juvenile courts with jurisdiction to decide whether federal immigration law has been violated, whether a state may condition wardship status, or any other state

---

[9] We note as well that our own Courts of Appeal have correctly concluded, albeit contrary to *Gutierrez v. City of Wenatchee, supra*, 662 F.Supp. 821, that state juvenile courts may determine a party's immigration status in the course of wardship proceedings. (See *In re Adolfo M.* (1990) 225 Cal.App.3d 1225, 1231–1232 [275 Cal.Rptr. 619]; *In re Manuel P.* (1989) 215 Cal.App.3d 48, 61–64 [263 Cal.Rptr. 447]; Welf. & Inst. Code, § 738.)

remedy or sanction, on the violation of a federal criminal immigration law is a separate question. The power to regulate is not necessarily coextensive with the power to adjudicate.

The "[p]ower to regulate immigration is unquestionably exclusively a federal power." (*De Canas v. Bica* (1976) 424 U.S. 351, 354 [47 L.Ed.2d 43, 96 S.Ct. 933]; see also *Hines v. Davidowitz* (1941) 312 U.S. 52, 62 [85 L.Ed. 581, 61 S.Ct. 399]; *Truax v. Raich* (1915) 239 U.S. 33, 42 [60 L.Ed. 131, 36 S.Ct. 7] ["The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government."].) Both the power and its asserted exclusivity are implicit in the structure of the Constitution, inferred as a consequence of various explicit grants of authority, including the powers to regulate commerce, establish rules for naturalization, and conduct foreign affairs. (*Toll v. Moreno* (1982) 458 U.S. 1, 10 [73 L.Ed.2d 563, 102 S.Ct. 2977]; see U.S. Const., art. I, § 8, cl. 3 [commerce power]; *id.*, cl. 4 [naturalization power]; *id.*, art. II, § 2, cl. 2 [treaty power].)

 While the immigration power is exclusive, it does not follow that any and all state regulations touching on aliens are preempted. (*De Canas v. Bica, supra*, 424 U.S. at p. 355.) Only if the state statute is in fact a "regulation of immigration," i.e., "a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain" (*ibid.*), is preemption structural and automatic. Otherwise, the usual rules of statutory preemption analysis apply; state law will be displaced only when affirmative congressional action compels the conclusion it must be. (*Id.* at pp. 356–357.) As Jose C. does not, and could not, contend Welfare and Institutions Code section 602 as applied here regulates who may enter or remain in the United States, we proceed under the usual preemption rules.

 We have identified four ways in which Congress may preempt state law: express, conflict, obstacle, and field preemption. (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1087 [72 Cal.Rptr.3d 112, 175 P.3d 1170]; *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936 [63 Cal.Rptr.3d 50, 162 P.3d 569]; see also *Pennsylvania v. Nelson, supra*, 350 U.S. at pp. 502–509 [same principles apply to preemption of criminal statutes].) Neither express nor conflict preemption is implicated here. Nothing in title 8 of the United States Code

expressly divests states of jurisdiction over all matters touching on immigration generally or alien smuggling in particular.[10] Nor is there any impossibility in complying simultaneously with state and federal law, as the state law here purports to incorporate the federal antismuggling law and thus adopts an identical rule.

Rather, the issue is one of field and obstacle preemption. "[F]ield preemption, i.e., 'Congress' intent to pre-empt all state law in a particular area,' applies 'where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.' " (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc., supra*, 41 Cal.4th at p. 936.) In turn, "obstacle preemption arises when ' "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citations.]" (*Ibid.*) Congress has by statute criminalized the smuggling of aliens into the United States (8 U.S.C. § 1324(a)); has it thereby occupied the field of alien smuggling, or would imposition of state juvenile wardships based on violations of section 1324 pose an obstacle to federal immigration policy's goals? Applying the general presumption against preemption (*Viva! Internat. Voice for Animals*, at p. 936), a presumption that applies even in the context of immigration law (see *De Canas v. Bica, supra*, 424 U.S. at p. 356 [requiring evidence that Congress has " 'unmistakably' " mandated preemption or the subject matter " 'permits no other conclusion' "]), we conclude not.

## 2. *Field preemption*

We discern no intent by Congress, in either its initial enactment or subsequent amendments of the Immigration and Nationality Act (INA) (8 U.S.C. §§ 1101–1537), to occupy the field of immigration law generally or alien smuggling in particular.

As a general matter, the United States Supreme Court has declined to "presume that Congress, in enacting the INA, intended to oust state authority to regulate . . . in a manner consistent with pertinent federal laws." (*De Canas v. Bica, supra*, 424 U.S. at p. 357.) Rather, after independently reviewing the INA, the *De Canas* court could not find "any specific indication in either the wording or the legislative history of the INA that Congress intended to preclude even harmonious state regulation touching on aliens in general." (*De Canas*, at p. 358.) Nor could it infer any such intent from the

---

[10] While there are some specific express preemption provisions, they do not touch upon any areas at issue here. (See, e.g., 8 U.S.C. § 1324a(h)(2) [preempting most state sanctions against those who employ unauthorized aliens].)

"scope and detail of the INA." (*Id.* at p. 359.) Accordingly, it rejected field preemption in the context of California legislation touching on the employment of aliens.

We reach the same conclusion in the context of alien smuggling and enforcement of immigration-related criminal law. A series of provisions in the INA demonstrate Congress, far from occupying the field, welcomed state and local assistance in enforcement.

Of greatest significance, title 8 United States Code section 1324(c) expressly allows for state and local enforcement of section 1324's alien smuggling provisions. Arrests for violations of section 1324 may be made by various designated immigration officers and by "all other officers whose duty it is to enforce criminal laws." (8 U.S.C. § 1324(c).) As the Court of Appeal in *People v. Barajas* (1978) 81 Cal.App.3d 999 [147 Cal.Rptr. 195] explained, the legislative history behind this section shows the quoted language was intended to preserve state and local authority to make arrests for criminal immigration violations. (*Id.* at pp. 1005–1006; see also *Gonzales v. City of Peoria* (9th Cir. 1983) 722 F.2d 468, 475 [concluding based on 8 U.S.C. § 1324 text and legislative history that "federal law does not preclude local enforcement of the criminal provisions of the" INA], overruled on another ground by *Hodgers-Durgin v. De La Vina* (9th Cir. 1999) 199 F.3d 1037, 1040, fn. 1.)

Three more recent amendments of the INA are to similar effect. Title 8 United States Code section 1357(g), adopted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Pub.L. No. 104-208 (Sept. 30, 1996) 110 Stat. 3009-546), authorizes states and localities to enter into written agreements with the United States Attorney General under which state and local officials will have authority to investigate, apprehend, and detain individuals for suspected violations of immigration law, and further emphasizes that even in the absence of a written agreement, state and local officials are free to cooperate with the United States Attorney General in the enforcement of immigration laws. (8 U.S.C. § 1357(g)(10).) Title 8 United States Code section 1103(c), amended at the same time, similarly authorizes the Commissioner of the Immigration and Naturalization Service to "enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws." Finally, title 8 United States Code section 1252c, adopted as part of the Antiterrorism and Effective Death Penalty Act

of 1996 (Pub.L. No. 104-132 (Apr. 24, 1996) 110 Stat. 1276), expressly authorizes state and local officials in specified circumstances to make arrests of individuals illegally present in the United States. "Both the plain language and legislative history of § 1252c reflect that Congress intended the provision to displace perceived Federal limitations on the authority of state and local officers to arrest 'criminal illegal aliens.' " (*U.S. v. Vasquez-Alvarez* (10th Cir. 1999) 176 F.3d 1294, 1300.)

Consistent with these provisions, those federal circuits to have addressed the question (the Fifth, Ninth, and Tenth) have unanimously concluded Congress has not occupied the field and preempted state assistance in the enforcement of federal criminal immigration law. The federal criminal regulation of immigration is not so complex or comprehensive that it may be inferred Congress intended to occupy the field. (*Gonzales v. City of Peoria, supra*, 722 F.2d at pp. 474–475.) Instead, "federal law 'evinces a clear invitation from Congress for state and local agencies to participate in the process of enforcing federal immigration laws.' " (*U.S. v. Santana-Garcia* (10th Cir. 2001) 264 F.3d 1188, 1193; see also *Lynch v. Cannatella* (5th Cir. 1987) 810 F.2d 1363, 1371 ["No statute precludes other federal, state, or local law enforcement agencies from taking other action to enforce this nation's immigration laws."].) These courts recognize that Congress has established a regime of cooperative federalism, in which local, state, and federal governments may work together to ensure the achievement of federal criminal immigration policy. This is the antithesis of field preemption.

In making his field preemption argument, Jose C. relies entirely on cases drawn from the area of industrial relations, an area in which "[i]t is by now a commonplace [understanding] that in passing the [National Labor Relations Act] Congress largely displaced state regulation . . . ." (*Wisconsin Dept. of Industry v. Gould Inc.* (1986) 475 U.S. 282, 286 [89 L.Ed.2d 223, 106 S.Ct. 1057]; see also *San Diego Unions v. Garmon* (1959) 359 U.S. 236, 246 [3 L.Ed.2d 775, 79 S.Ct. 773].) As Congress has instead embraced a role for the states in the area of criminal immigration law, these cases are not persuasive.

### 3. *Obstacle preemption*

"There remains the question whether, although the INA contemplates some room for state legislation, [Welfare and Institutions Code section 602] is nevertheless unconstitutional because it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in enacting the INA." (*De Canas v. Bica, supra*, 424 U.S. at p. 363, quoting *Hines v. Davidowitz, supra*, 312 U.S. at p. 67.) Put in the affirmative, "the States do have some authority to act with respect to illegal aliens, at least

where such action mirrors federal objectives and furthers a legitimate state goal." (*Plyler v. Doe* (1982) 457 U.S. 202, 225 [72 L.Ed.2d 786, 102 S.Ct. 2382].) Does Welfare and Institutions Code section 602's incorporation of federal criminal immigration law "mirror[] federal objectives" and further a legitimate state interest? We think it manifest that it does.

That Welfare and Institutions Code section 602 mirrors federal objectives we infer from two separate grounds. First, it incorporates criminal immigration law and thereby adopts the same standards; that which is a violation of federal criminal immigration law is a violation under Welfare and Institutions Code section 602, while that which is not, is not. Where state law "mandates compliance with the federal immigration laws and regulations, it cannot be said [state law] stands as an obstacle to accomplishment and execution of congressional objectives embodied in the INA." (*In re Manuel P., supra*, 215 Cal.App.3d at p. 64.)

Second, as we shall explain, Congress's passage of the Juvenile Justice and Delinquency Prevention Act of 1974 (Delinquency Prevention Act) (18 U.S.C. §§ 5031–5042), and in particular title 18 United States Code section 5032, demonstrates that Welfare and Institutions Code section 602 is wholly consistent with federal objectives. The text and history behind the Delinquency Prevention Act show that state juvenile dispositions for offenders who may have violated a federal criminal statute are no obstacle to federal goals; to the contrary, Congress strongly prefers such outcomes.

Title 18 United States Code section 5032, with limited exceptions not applicable here, establishes a presumption that juveniles who are alleged to have violated federal criminal law shall be proceeded against in state juvenile court. An alleged juvenile delinquent "shall not be proceeded against in any court of the United States unless the Attorney General" certifies that one of three conditions has been met: (1) the state court "does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency," (2) no adequate state juvenile program exists, or (3) the crime is one of a specified list of drug- and violence-related offenses. (18 U.S.C. § 5032.) The text thus establishes a strong preference for juvenile offenders to be channeled into and handled by state juvenile courts whenever jurisdiction exists for the state courts to accept them.

The legislative history of the Delinquency Prevention Act is to the same effect. Congress recognized juvenile delinquency as "essentially a State and local problem which must be dealt with by the State and local governments." (Sen.Rep. No. 93-1011, 2d Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News, pp. 5283, 5286.) However, because "[f]ederal

assistance is very necessary to provide needed financial assistance and resources" (*ibid.*), Congress passed the Delinquency Prevention Act to "provide[] for Federal leadership and coordination of the resources necessary to develop and implement at the State and local community level effective programs for the prevention and treatment of juvenile delinquency" (1974 U.S. Code Cong. & Admin. News, p. 5283). The measure was intended to afford "[a]ssistance in the development of State and local mechanisms designed to channel juveniles, for whom the criminal justice system is inappropriate, away from and out of the system into human problem-solving agencies and professions." (*Id.* at p. 5287.) "Congress 'recognized that the federal court system is at best ill equipped to meet the needs of juvenile offenders. Deference to the state courts should always be observed except in the most severe of cases.' " (*U.S. v. Chambers* (6th Cir. 1991) 944 F.2d 1253, 1258, quoting *United States v. Juvenile* (D.Or. 1984) 599 F.Supp. 1126, 1130; see also *U.S. v. Juvenile Male* (9th Cir. 1988) 864 F.2d 641, 644 ["Congress' desire to channel juveniles into state and local treatment programs . . . [is] clearly expressed in the legislative history of [18 U.S.C.] section 5032 . . ."]; Note, *There's No Place Like Home: The Availability of Judicial Review Over Certification Decisions Invoking Federal Jurisdiction Under the Juvenile Justice and Delinquency Prevention Act* (2000) 53 Vand. L.Rev. 1311, 1314–1320, 1340–1341 [reviewing history of long-standing congressional preference for state treatment of juvenile delinquency].)

Clearly, then, Welfare and Institutions Code section 602's incorporation of federal criminal law so that juvenile delinquents who violate federal law may be handled through state wardship proceedings is no obstacle to federal goals; instead, it ensures precisely the approach Congress expressly prefers.

It is equally evident Welfare and Institutions Code section 602 furthers legitimate state interests. The purposes of juvenile wardship proceedings are twofold: to treat and rehabilitate the delinquent minor, and to protect the public from criminal conduct. (*In re Jerald C.* (1984) 36 Cal.3d 1, 8 [201 Cal.Rptr. 342, 678 P.2d 917] (lead opn. of Broussard, J.); *In re Calvin S.* (2007) 150 Cal.App.4th 443, 449 [58 Cal.Rptr.3d 559]; Welf. & Inst. Code, § 202.) The preservation of the safety and welfare of a state's citizenry is foremost among its government's interests, and it is squarely within the police power to seek to rehabilitate those who have committed misdeeds while protecting the populace from further misconduct. As Welfare and Institutions Code section 602 does this in a fashion that mirrors and is wholly consistent with federal aims, it poses no obstacle to federal policy and is not preempted.

## DISPOSITION

For the foregoing reasons, we affirm the Court of Appeal's judgment.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.