Opinion by Judge BERNARD.
¶ 1 Defendant, Bernardino Fuentes-Espinoza, was charged with, and convicted of, transporting seven passengers in violation of Colorado's human smuggling statute, section 18-13-128, C.R.S.2012. None of these alleged passengers was available to testify at trial, and the prosecution did not establish whether any of them was illegally present in the United States.
¶ 2 On appeal, defendant asks us to decide two issues regarding Colorado's human smuggling statute. First, is the statute preempted by federal immigration law? Second, does the statute require the prosecution to prove, beyond a reasonable doubt, that the person being smuggled was illegally present in the United States? We answer both of these questions "no."
¶ 3 We also disagree with defendant's three other contentions. As a result, we affirm.
I. Analysis
A. The Trial Court's Jurisdiction Was Not Preempted by Federal Law
¶ 4 Defendant argues that Colorado's human smuggling statute is preempted by federal law. He concedes that he did not preserve this issue for appellate review by presenting it to the trial court.
¶ 5 Defendant contends, however, that federal preemption of a criminal statute provides a jurisdictional bar to prosecution that cannot be waived. See State v. Perry, 83 Ohio St.3d 41, 697 N.E.2d 624, 627 (1998) (stating in dicta that "preemption is a jurisdictional bar to prosecution").
¶ 6 Our supreme court has not addressed whether federal preemption is a jurisdictional-and therefore a nonwaivable-defense. See Town of Carbondale v. GSS Props., LLC, 169 P.3d 675, 683 (Colo.2007) (addressing state preemption of local law, but recognizing "that preemption involving federal law may raise a separate set of issues"). Nevertheless, GSS Properties identified a useful framework that has been employed by courts considering federal preemption.
Courts considering the matter have held that the waivability of a preemption defense depends entirely on the nature of the alleged preemption. If, as in most cases, the alleged preemption would simply alter the applicable substantive law governing the case, then preemption is waivable....
Conversely, if preemption "affects the choice of forum rather than the choice of law," then preemption is akin to a jurisdictional challenge and therefore is not waivable.
Thus, the United States Supreme Court in International Longshoremen's Association held that preemption was not waivable because the federal statute in question preempted state law and provided that federal courts were the exclusive fora for litigating claims under the statute.
GSS Properties, 169 P.3d at 682 (citations omitted) (quoting Gorman v. Life Ins. Co. of N. Am., 811 S.W.2d 542, 545-46 (Tex.1991) ).
¶ 7 International Longshoremen's Ass'n v. Davis, 476 U.S. 380, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986), addressed preemption of state jurisdiction by the National Labor Relations Act (NLRA), citing San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). The Court held that
when a state proceeding or regulation is claimed to be pre-empted by the NLRA under Garmon, the issue is a choice-of-forum rather than a choice-of-law question. As such, it is a question whether the State or the Board has jurisdiction over the dispute.
*821 If there is pre-emption under Garmon, then state jurisdiction is extinguished.
Int'l Longshoremen's Ass'n, 476 U.S. at 391, 106 S.Ct. 1904. Having concluded that the issue involved jurisdictional preemption, the Court further held that "when a claim of Garmon pre-emption is raised, it must be considered and resolved by the state court," state procedural rules notwithstanding. Id. at 393, 106 S.Ct. 1904.
¶ 8 Significantly, the Court emphasized that not all preemption claims are necessarily jurisdictional:
We note that this conclusion derives from congressional intent as delineated in our prior decisions. Thus, our decision today does not apply to pre-emption claims generally but only to those pre-emption claims that go to the State's actual adjudicatory or regulatory power as opposed to the State's substantive laws. The nature of any specific pre-emption claim will depend on congressional intent in enacting the particular preempting statute.
Id. at 391 n. 9, 106 S.Ct. 1904.
¶ 9 This distinction leads us to conclude that the GSS Properties framework can be applied to issues of federal preemption. Therefore, we must determine whether the preemption argument urged by defendant is jurisdictional-affecting choice of forum-or substantive-affecting choice of law. To the extent that defendant's argument involves jurisdictional preemption, we must address it.
¶ 10 Conversely, we conclude that defendant's arguments regarding substantive preemption are not properly before us. People v. Cagle, 751 P.2d 614, 619 (Colo.1988), holds generally that "[it] is axiomatic that this court will not consider constitutional issues raised for the first time on appeal." Our supreme court cited Cagle for this proposition as recently as two years ago. Martinez v. People, 244 P.3d 135, 139 (Colo.2010) (declining to reach an argument based on the Colorado Constitution because it was not raised below).
¶ 11 The supreme court has also stated that it will not address the constitutionality of a statute if such an attack "is not presented to the trial court and is [instead] raised for the first time on appeal." People v. Lesney, 855 P.2d 1364, 1366 (Colo.1993) ; accord People v. Martinez, 634 P.2d 26, 32 (Colo.1981). However, the supreme court has also held that, in certain circumstances, it will review unpreserved constitutional challenges to statutes to "promote efficiency and judicial economy." Hinojos-Mendoza v. People, 169 P.3d 662, 667-68 (Colo.2007) ; see also People v. Wiedemer, 852 P.2d 424, 433 n. 9 (Colo.1993).
¶ 12 Divisions of this court are split on when to review unpreserved constitutional errors. For example, as the majority in People v. Tillery, 231 P.3d 36, 47-48 (Colo.App.2009), aff'd on other grounds sub nom. People v. Simon, 266 P.3d 1099 (Colo.2011), points out, some divisions have declined to consider unpreserved double jeopardy claims, while others have proceeded to do so by applying plain error principles.
¶ 13 Some divisions review unpreserved constitutional attacks on statutes that they conclude can be determined by referring to the existing record, but they decline to review others that would require a more fully developed record to resolve. People v. Devorss, 277 P.3d 829, 834 (Colo.App.2011) ; People v. Greer, 262 P.3d 920, 929-30 (Colo.App.2011).
¶ 14 Other divisions have simply declined to review unpreserved constitutional attacks on statutes. People v. Baker, 178 P.3d 1225, 1235 (Colo.App.2007) ; People v. Shepherd, 43 P.3d 693, 701 (Colo.App.2001) ; People v. Boyd, 30 P.3d 819, 820 (Colo.App.2001).
¶ 15 At least two judges have written separately to express their differing views about when and how unpreserved attacks on the constitutionality of statutes should be reviewed on appeal. Greer, 262 P.3d at 933-37 (J. Jones, J., specially concurring); Tillery, 231 P.3d at 55-56 (Bernard, J., specially concurring).
¶ 16 We are persuaded by Lesney and Cagle, and so we conclude that we will not consider the unpreserved constitutional attack on the statute in this case involving substantive preemption. See Tillery, 231 P.3d at 55 (Bernard, J., concurring) ("plain error review in Colorado does not encompass *822 unpreserved constitutional attacks on statutes").
¶ 17 However, we recognize that the dissent in this case relies on reasonable authority when it proceeds to address the issue that we decline to consider. Because different divisions of this court continue to resolve this question differently, it is our respectful hope that our supreme court will resolve this dispute in the near future.
1. Jurisdictional Versus Substantive Preemption in the Context of Immigration Law
[W]hether Congress has preempted state court jurisdiction is not to be confused with whether it has preempted state legislative action. The former involves only the question whether a state court has the power to entertain a particular cause; the latter involves the further question whether a state may enact substantive legislation governing the subject matter of the particular cause.
In re Jose C., 45 Cal.4th 534, 87 Cal.Rptr.3d 674, 198 P.3d 1087, 1095 (2009) (emphasis in original).
a. Jurisdictional Preemption
¶ 18 Congress has granted federal courts jurisdiction over criminal matters relating to immigration. See 8 U.S.C. § 1329 ("The district courts of the United States shall have jurisdiction of all causes, civil and criminal, brought by the United States that arise under the provisions of this subchapter."). Although the statute grants jurisdiction to federal courts, it does not expressly exclude state court jurisdiction. The absence of language ousting state courts of their presumptive jurisdiction "is strong, and arguably sufficient, evidence that Congress had no such intent." Yellow Freight System, Inc. v. Donnelly, 494 U.S. 820, 823, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990) ; cf. Int'l Longshoremen's Ass'n, 476 U.S. at 389, 106 S.Ct. 1904 (by creating and vesting jurisdiction in the National Labor Relations Board, Congress excluded not only state courts but also federal courts from adjudicating certain cases subject to the NLRA); accord DeCanas v. Bica, 424 U.S. 351, 355, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) ("the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by [the exclusive federal] constitutional power" to regulate immigration); see also Arizona v. United States, 567 U.S. 387, ----, 132 S.Ct. 2492, 2500-01, 183 L.Ed.2d 351 (2012) (preemption occurs when (1) Congress expressly withdraws specified powers from states; (2) Congress determines that it will exclusively regulate a particular field; or (3) the laws of a state conflict with federal law).
¶ 19 We therefore conclude that federal immigration law does not inherently preempt state court jurisdiction over all matters touching on issues of immigration.
b. Substantive Preemption
¶ 20 The question of substantive preemption asks "whether, though state court jurisdiction exists, Congress has preempted states from substantively regulating immigration matters, and in particular alien smuggling." In re Jose C., 87 Cal.Rptr.3d 674, 198 P.3d at 1097. A statute may be substantively preempted if (1) the statute actually regulates immigration, DeCanas, 424 U.S. at 354-55, 96 S.Ct. 933 ; (2) the clear and manifest purpose of Congress was to preclude state regulation touching aliens in general, id. at 356-58, 96 S.Ct. 933 ; or (3) the state statute stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the federal law. Id. at 363, 96 S.Ct. 933 ; see also State v. Barragan-Sierra, 219 Ariz. 276, 196 P.3d 879, 889-91 (Ariz.Ct.App.2008) (applying DeCanas and holding that Arizona's human smuggling statute is not preempted by federal immigration law); State v. Flores, 218 Ariz. 407, 188 P.3d 706, 710-11 (Ariz.Ct.App.2008) (same); but see Eric M. Larsson, Annotation, Preemption of State Statute, Law, Ordinance, or Policy with Respect to Law Enforcement or Criminal Prosecution as to Aliens, 75 A.L.R. 6th 541 § 6 (2012)(discussing decisions from different jurisdictions that hold state human smuggling statutes to be preempted by federal immigration laws).
2. Application
¶ 21 Here, to the extent that defendant contends that the trial court's authority to *823 adjudicate the charges against him was jurisdictionally preempted, his argument fails.
¶ 22 In substance, defendant argues that Colorado's human smuggling statute is preempted under the DeCanas test. Thus, his challenge is properly characterized as a claim of substantive preemption. As discussed above, however, defendant did not preserve the issue of substantive preemption for appellate review, and, therefore, we decline to address it.
B. The Human Smuggling Statute Does Not Require Proof That the Defendant's Passenger Violated Immigration Laws
¶ 23 Defendant raises several challenges to his convictions that turn on the question whether Colorado's human smuggling statute requires the prosecution to prove that the person to be transported actually violated federal immigration laws. We conclude that such proof is not required.
1. Standard of Review
¶ 24 Statutory interpretation is a question of law we review de novo. People v. Garcia, 113 P.3d 775, 780 (Colo.2005). Our goal is to give effect to the legislative intent. People v. Martinez, 70 P.3d 474, 477 (Colo.2003). We begin with the statutory language, reading words and phrases in context and giving them their commonly accepted and understood meanings. Id.; People v. Vecellio, 2012 COA 40, ¶ 14, 292 P.3d 1004. "If the statutory language is clear and unambiguous, we do not engage in further statutory analysis and apply the statute as written." Vecellio, ¶ 14. "Only when the language is ambiguous may we consider extraneous sources, such as legislative history, to arrive at the proper meaning." Rickstrew v. People, 822 P.2d 505, 509 (Colo.1991).
2. Analysis
¶ 25 Section 18-13-128(1), C.R.S.2012, provides:
A person commits smuggling of humans if, for the purpose of assisting another person to enter, remain in, or travel through the United States or the state of Colorado in violation of immigration laws, he or she provides or agrees to provide transportation to that person in exchange for money or any other thing of value.
(Emphasis added.)
¶ 26 Interpreting similar language in Colorado's conspiracy statute, a division of this court held that a person may be guilty of conspiracy even where his or her accomplice merely feigns agreement. See Vecellio, 2012 COA 40, ¶ 18, 292 P.3d 1004. Section 18-2-201(1), C.R.S.2012, provides that "[a] person commits conspiracy to commit a crime if, with the intent to promote or facilitate its commission, he agrees with another person" to engage in criminal conduct. (Emphasis added.) The division held that the statute's focus on "the actions of a single actor agreeing with another" showed the legislature's intent to criminalize such conduct regardless whether the second party actually shared the defendant's criminal intent. Id. This "approach is justified, in part, because a person plotting a crime with a feigning accomplice has a guilty mind." Id. at ¶ 23.
¶ 27 Other language in section 18-13-128(1) also emphasizes the defendant's state of mind. The prosecution must prove that the defendant had "the purpose of assisting another person to enter, remain in, or travel through the United States or the state of Colorado in violation of immigration laws." § 18-13-128(1) (emphasis added). The plain meaning of the phrase "for the purpose of" "indicates an anticipated result that is intended or desired." Colo. Ethics Watch v. City & Cnty. of Broomfield, 203 P.3d 623, 625 (Colo.App.2009) (citing Webster's Third New International Dictionary 1946 (2008)). Thus, by including the defendant's purpose as an element of the offense, the statute further evinces the legislature's intent to criminalize the defendant's conduct based on his or her guilty mind, independent of the actions or intent of another person.
¶ 28 We reject defendant's contention that the statute's references to the person to whom an accused provides or agrees to provide transportation establish that the prosecution must prove an actual violation of immigration laws by that person. We do so for three reasons.
¶ 29 First, as discussed above, the statute's focus is on the actions of a single actor *824 providing or agreeing to provide transportation to another person.
¶ 30 Second, by including the actor's purpose as an element of the crime, the statute emphasizes the actor's intent, rather than the outcome of his or her actions. To require proof that the accused's intended passenger actually violated immigration laws "would improperly conflate the distinct concepts of purpose and effect." Colo. Ethics Watch, 203 P.3d at 625.
¶ 31 Third, we disagree with defendant's assertion that, when the human smuggling statute is read as a whole, the nonelemental subsections demonstrate that the passenger's actual immigration status is central to a determination of guilt.
¶ 32 Section 18-13-128 further provides, in relevant part:
(3) A person commits a separate offense for each person to whom he or she provides or agrees to provide transportation in violation of subsection (1) of this section.
(4) Notwithstanding the provisions of section 18-1-202 [the general criminal venue statute], smuggling of humans offenses may be tried in any county in the state where a person who is illegally present in the United States who is a subject of the action is found.
¶ 33 Defendant argues that (1) the creation of a separate offense for each of the accused's passengers, and (2) the reference to "a person who is illegally present ... who is a subject of the action" compel a conclusion that the legislature intended to require proof of the passenger's illegal presence as an element of the offense.
¶ 34 However, an analogous argument was implicitly rejected by another division of this court when it interpreted similar language in Colorado's child enticement statute.
¶ 35 In Vecellio, the defendant was convicted of child enticement after he arranged to meet with a mother and her thirteen-year-old daughter for sex. 2012 COA 40, ¶¶ 2-5, 292 P.3d 1004. In reality, the "mother" was an undercover police officer, and the "daughter" did not exist. Id. The child enticement statute provides, in relevant part:
A person commits the crime of enticement of a child if he or she invites or persuades, or attempts to invite or persuade a child under the age of fifteen years to enter any vehicle, building, room, or secluded place with the intent to commit sexual assault or unlawful sexual contact upon said child. It is not necessary to a prosecution for attempt under this subsection (1) that the child have perceived the defendant's act of enticement.
§ 18-3-305(1), C.R.S.2012 (emphasis added).
¶ 36 Despite references in the statute to "said child" and "the child," a division of this court held that the evidence was sufficient to sustain the defendant's conviction, even though the "child" he attempted to entice did not exist. Vecellio, 2012 COA 40, ¶¶ 46-48, 292 P.3d 1004.
¶ 37 Here, the provision establishing that a defendant may be charged with a separate offense for each actual or intended passenger remains focused on the actions of the accused. The venue provision of the human smuggling statute refers to "a person who is illegally present in the United States who is a subject of the action." However, this provision is concerned with venue and does not add an element to the offense of human smuggling. Accord § 18-1-202(11), C.R.S.2012 (venue is not an element of an offense).
¶ 38 Thus, neither provision changes the definition of the offense by adding an element-the passenger or intended passenger's illegal presence-or by shifting the focus from the defendant's actions and purpose.
¶ 39 We therefore conclude that section 18-13-128 does not require the prosecution to prove that the defendant's passenger or intended passenger was illegally present in the United States or Colorado in violation of immigration laws. Further, because this meaning is evident in the plain language of the statute, we may not consider the parties' arguments regarding legislative history. See Rickstrew, 822 P.2d at 509.
¶ 40 Based on these conclusions, we necessarily reject defendant's assertions that
• the trial court erred by not instructing the jury that the prosecution must prove that defendant's passengers were violating immigration laws;
*825 • the trial court erred by not instructing the jury, in answer to its question, that the prosecution must prove that the passengers were illegal immigrants;
• the prosecutor committed misconduct by telling the jury that the prosecution was not required to prove that the passengers were violating immigration laws;
• the prosecutor committed misconduct by citing legislative history in support of his arguments to the trial court without disclosing that he had testified at a House committee hearing on the bill that became section 18-13-128 ; and
• the evidence was insufficient to support defendant's convictions because it did not establish that his passengers had violated immigration laws.
C. Sufficient Evidence Supported the Convictions
¶ 41 Defendant contends that the evidence was insufficient to support his convictions because it did not establish that he transported any of the persons named in the complaint. We disagree.
¶ 42 We review the sufficiency of evidence de novo. People v. Rincon, 140 P.3d 976, 983 (Colo.App.2005).
[C]hallenges to the sufficiency of the evidence to support a criminal conviction require a reviewing court to determine whether the evidence, both direct and circumstantial, when viewed as a whole and in a light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crime beyond a reasonable doubt.
Taylor v. People, 723 P.2d 131, 134 (Colo.1986).
¶ 43 When reviewing for sufficiency of the evidence, a court must give the prosecution the benefit of every reasonable inference that might be drawn from the evidence. Kogan v. People, 756 P.2d 945, 950 (Colo.1988), abrogated on other grounds by Erickson v. People, 951 P.2d 919, 923 (Colo.1998).
¶ 44 Here, defendant and the seven alleged passengers were taken into custody outside a gas station and convenience store. The arresting officer testified that
• the female passenger and another alleged passenger had been inside defendant's van;
• a third alleged passenger stood next to defendant while he fixed a taillight on the van;
• three more alleged passengers were using a pay phone outside the convenience store;
• a seventh alleged passenger approached the group while they were speaking with the officer; and
• the seven alleged passengers told the officer their names, and six of them provided identification.
The arresting officer also testified about statements that defendant made after the officer asked him who the people in the van were. Defendant stated that
• the "female" was his cousin and the rest were his friends; and
• they all were returning from Las Vegas.
The officer looked into the van and saw that
• there were no additional clothes;
• there was no luggage; and
• there was a water bottle containing a liquid that looked like urine.
An FBI agent interviewed defendant after the arrest. Defendant told the agent that
• he was driving the van because a man named Eric Castel had approached him in Las Vegas, Nevada, and offered him $500 to drive members of Mr. Castel's family from Phoenix, Arizona, to Kansas City;
• defendant would be paid when he delivered the people to their destination in Kansas City;
• Mr. Castel drove defendant to Phoenix, where Mr. Castel asked him to wait in an unfurnished apartment;
• Mr. Castel returned with the van, and it was full of people;
• Mr. Castel gave defendant $600 in travel money, and a map with a designated route;
• Mr. Castel also gave him a cellular telephone number, which defendant *826 was to call if anyone in the van tried to leave before its final destination;
• defendant realized that he "wasn't going to be ... transporting" Mr. Castel's family members, but, instead, he thought he would be transporting "[i]llegal aliens";
• he only knew one of the people in the van;
• the only statement he made to them when he got in the van was "hello";
• when the police officer approached the convenience store, two people who had been in the van ran away and were not apprehended;
• including the two people who fled, there had been eleven people in the van; and
• defendant did not get paid because he did not deliver the people to Kansas City.
¶ 45 In addition, the store clerk testified that defendant entered the store with a group of seven or eight people and that defendant either gave them money or paid for their purchases directly.
¶ 46 Viewed in the light most favorable to the prosecution, this evidence supports a reasonable inference that the seven persons named in the complaint were traveling together in defendant's van. We therefore conclude that sufficient evidence supported defendant's convictions.
D. Confrontation Clause
¶ 47 Defendant contends that the trial court erred by allowing the arresting officer to testify that, when the seventh alleged passenger approached, the officer "found out that he was a passenger." We perceive no reversible error.
¶ 48 Confrontation Clause violations are trial errors. Raile v. People, 148 P.3d 126, 133 (Colo.2006). Where, as here, a defendant raises a timely confrontation objection, we review under the constitutional harmless error standard, asking whether the error was harmless beyond a reasonable doubt. Id. The inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). "[A] reviewing court must look at the trial as a whole and decide whether there is a reasonable probability that the defendant could have been prejudiced by the error." People v. Fry, 92 P.3d 970, 980 (Colo.2004).
¶ 49 Assuming, without deciding, that it was error to admit the officer's statement, we conclude for several reasons that any such error was harmless beyond a reasonable doubt.
¶ 50 First, even without the officer's statement, sufficient evidence supports defendant's convictions as to the seventh passenger because (1) defendant was accompanied by a group of at least seven persons in the convenience store; (2) defendant paid for purchases made by the members of his group; and (3) the seventh person named in the complaint demonstrated his membership in the group by approaching them while the other six members of the group were speaking with the officer. See Blecha v. People, 962 P.2d 931, 942 (Colo.1998) (factors to consider in harmless error analysis of confrontation violation include the importance of the witness's testimony to the prosecution's case and whether the testimony was cumulative).
¶ 51 Second, the officer made the statement to explain his motive for questioning the seventh person with the rest of the group. The statement was a brief reference in the context of lengthy testimony that spanned two days of trial.
¶ 52 Third, no further mention was made of the statement during the trial, and the prosecution did not allude to it in closing argument.
¶ 53 Fourth, defense counsel conceded in opening argument that defendant was transporting the people in the van; defendant's theory of defense was that he did not know the people were illegal immigrants.
¶ 54 We therefore conclude that there is no reasonable probability that defendant was prejudiced by the admission of the officer's statement.
*827 E. The Prosecutor's Use of the Word "Lie" Does Not Warrant Reversal
¶ 55 Defendant contends that reversal is required because the prosecutor committed misconduct in closing argument by suggesting that defendant lied to police. We disagree.
¶ 56 "In this jurisdiction it is improper for a lawyer to use any form of the word 'lie' in characterizing for a jury a witness's testimony or his truthfulness." Crider v. People, 186 P.3d 39, 41 (Colo.2008) ; see also Domingo-Gomez v. People, 125 P.3d 1043, 1050 (Colo.2005) ("The word 'lie' is such a strong expression that it necessarily reflects the personal opinion of the speaker. When spoken by the State's representative in the courtroom, the word 'lie' has the dangerous potential of swaying the jury from [its] duty to determine the accused's guilt or innocence on the evidence properly presented at trial.").
¶ 57 We review a violation of this tenet for harmless error. Crider, 186 P.3d at 43. Where
the impropriety [is] limited to the prosecutor's use of an inflammatory term, as distinguished from drawing the jury's attention to the contradictory physical evidence in more neutral terms, the task of assessing the harmfulness of the error is similarly limited. The error must therefore be accounted harmless if there is no reasonable probability, in light of the physical evidence, that the differences between arguing that the defendant's contradictory statements were lies and arguing simply that they could not reasonably be believed, contributed to the jury's verdict.
Id. at 44.
¶ 58 Here, the prosecutor referred in closing argument to the fact that defendant had repeatedly and quickly changed his answers to the arresting officer's questions, giving conflicting explanations for his actions. The prosecutor characterized this as "making up stories" and stated:
People need reasons to lie. He doesn't just compulsively make up stories here. He needed a reason to lie. And that reason was to protect himself.
¶ 59 Viewing the closing argument as a whole, we are convinced that there is no reasonable probability that the use of the word "lie" contributed to the jury's verdict in this case. As the trial court noted, the prosecutor "said lie, not liar." See Crider, 186 P.3d at 44 ("it was significant that the prosecutor did not refer to the defendant as a 'liar' "). Although the prosecutor made several references to "stories," he did not use any form of the word "lie" again. Under these circumstances, the prosecutor's suggestion that defendant had a "reason to lie" was not so inflammatory as to give rise to a reasonable probability that "the differences between arguing that the defendant's contradictory statements were lies and arguing simply that they could not reasonably be believed ... contributed to the jury's verdict." Id.
¶ 60 We therefore conclude that no reversible error occurred.
¶ 61 The judgment is affirmed.
Judge BOORAS concurs.
Judge CASEBOLT dissents.