Filed 3/29/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NANETTE SHEREE DILLARD, et al.,<br><br>    Defendants and Appellants. | A141998<br><br>(Alameda County<br>Super. Ct. Nos. CH-53179A &<br>CH-53179B) |

Nanette Sheree Dillard and Paul Daniels appeal their convictions, following a jury trial, of crimes related to their work at an anti-poverty agency, the Associated Community Action Program (ACAP or the Agency). We conclude two of appellants' convictions were preempted by federal law and reverse these convictions. We otherwise affirm.

PROCEDURAL BACKGROUND

Dillard and Daniels were charged by amended information with the following:

Count 1: Conspiracy to commit grant theft by false pretenses (Pen. Code, §§ 182, subd. (a)(1), 487, subd. (a))[1], with overt acts of drafting, signing, and delivering a letter to the United States Department of Health and Human Services (HHS) "falsely attesting"

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II–IV.

[1] All undesignated section references are to the Penal Code.

that ACAP had more than $426,000 in " 'non-federal match funds' " in a Citibank account, and sending a draft of such a letter to a Citibank manager.

Count 2: Grand theft by false pretenses (§ 487, subd. (a)) by unlawfully taking grant funds from HHS. This count included an allegation that the property taken exceeded $200,000 (§ 12022.6, subd. (a)(2)).

Count 3: Making a false account of public moneys (§ 424, subd. (a)(3)) by signing and sending false and inaccurate letters to HHS. A third co-defendant, Vivian Rahwanji, was also charged with this count. Rahwanji entered into a plea agreement with the People on the eve of trial and, as part of this agreement, testified as a prosecution witness.

Count 4: Using public moneys for a purpose not authorized by law (§ 424, subd. (a)(2)), by improperly using over $280,000 of funds intended for a HHS grant program to fund Agency payroll and other Agency expenses.

In addition, Dillard was charged with the following:

Count 5: Appropriating public moneys to her own use (§ 424, subd. (a)(1)), by instructing employees to work on her personal residence at below-market rates and obtaining reimbursement for improper business expenses, such as massages and expensive meals.

Count 6: Preparing false and ante-dated documentary evidence (§ 134), by preparing a memoranda regarding the residency status of Agency clients and an agenda of a seminar at a hotel.

Following a lengthy trial, the jury convicted appellants of theft by false pretenses (count 2) and making a false account of public moneys (count 3), and convicted Dillard of preparing false documentary evidence (count 6). The jury acquitted appellants on all remaining counts.

FACTUAL BACKGROUND

*The Agency*

ACAP was an anti-poverty agency created pursuant to a joint powers agreement between Alameda County (the County) and several cities in the County. A governing board (the Board) consisted of representatives from each of the municipalities and,

2

among other powers, selected the Agency's executive director. Dillard was appointed the Agency's interim executive director in 2004 and its executive director in 2005. Daniels was hired as an administrative assistant at the Agency in 2004, and was promoted to grants manager the following year. Daniels and Dillard married in 2007.

*The Assets for Independence Grant Program*

In June 2005, the Agency sought, and was awarded, a five-year, $500,000 Assets for Independence (AFI) grant from HHS. Two HHS employees testified about the rules governing AFI grants: Katrina Morgan, an HHS grants management officer, and Anne Yeoman, a 10-year contract employee with HHS who worked primarily on the AFI program. AFI grants are awarded to organizations or agencies to fund programs that help low-income people build assets. We will refer to the organizations or agencies administering the AFI programs as "grantees," and the low-income individuals served by these programs as "savers." In an AFI program, savers deposit money in a designated individual bank account. These deposits are matched with federal AFI grant funds and an equal amount of nonfederal funds. The matched deposits can be withdrawn for approved uses, including higher education, starting a business, or buying a house.

Grantees do not receive the federal AFI money when the grant is awarded. Instead, during the five-year grant period, grantees periodically "drawdown" some or all of the federal grant funds into a dedicated bank account maintained by the grantee, called the reserve account. A grantee can only drawdown federal funds for which it has an equal amount of nonfederal funds on deposit, referred to as "matching nonfederal funds." Before each drawdown, grantees must submit to HHS a letter requesting the drawdown and a letter from the bank holding the reserve fund confirming the presence of matching nonfederal funds in that account. AFI federal grant funds must be drawn down into the reserve account within the five-year grant period, and the distribution of grant funds to savers must be completed by the end of an additional year. Grantees can spend no more than 15 percent of the drawn down federal AFI funds on program administration; the remainder must be used to match saver deposits. HHS provides grantees with an "AFI

3

Grantee Handbook," an AFI resource center available to answer grantee questions by phone or email, and in-person trainings at grantee conferences.

*The Agency's Drawdowns of Federal AFI Grant Funds*

The Agency's AFI reserve account, and the hundreds of individual saver deposit accounts participating in the Agency's AFI program, were held at a Citibank branch. The reserve account was the "umbrella" account, and the individual saver accounts were attached to the reserve account. Vivian Rahwanji was the manager of that Citibank branch. Dillard was the sole signatory on the AFI reserve account, and both she and Daniels had access to the AFI account records.

The Agency's five-year AFI grant period ended on June 14, 2010; this date was the last day the Agency could drawdown federal AFI funds. As of the beginning of that month, the Agency had drawn down less than $75,000 out of the $500,000 available federal AFI funds. On June 10, although the Agency only had approximately $47,000 in its AFI reserve account, Daniels emailed Rahwanji a template letter to HHS stating the Agency had $426,874.44 of "non-federal match funds" on deposit in its AFI reserve account and requested she "place the letter on Citibank stationary [and] sign it."[2] Rahwanji did so. Daniels sent the Citibank letter to HHS and HHS transferred the requested federal AFI grant funds to the Agency's reserve account. The prosecution argued this letter was the basis for the theft by false pretenses and false account of public moneys counts (counts 2 and 3)—even though the letter was signed by Rahwanji, the People argued appellants prepared the letter knowing Rahwanji would "rubber-stamp" it and/or aided and abetted her act.[3]

---

[2] The parties presented evidence of emails and telephone calls leading up to this June 10 email; we omit these facts as unnecessary to our resolution of the appeal.

[3] Dillard, Daniels, and Rahwanji all testified they believed the savers' deposits could be counted as "non-federal match funds." The combined individual saver accounts contained less than $200,000. Daniels testified he relied on Rahwanji to verify the amount before she signed the letter. Rahwanji testified she attempted to so verify but abandoned the cumbersome task, believing based on an "eyeball" assessment that the figures were about right.

*Events Following the June 2010 Drawdown*

In August of 2010, the Agency did not have enough funds to meet payroll and AFI federal grant funds were used for this purpose. By February 1, 2011, approximately $280,000 of the federal AFI funds had been used for payroll and approximately $40,000 had been transferred to an Agency "petty cash" account.[4] The People confirmed in closing statements that they were not alleging appellants used AFI funds for their own personal use.

On February 2, 2011, the Board placed Dillard on administrative leave. Both appellants were subsequently terminated.

Following appellants' termination, an independent audit determined the Agency was in financial disarray and the Board decided to dissolve it. The interim executive director in charge of overseeing the Agency's dissolution determined that out of the nearly $500,000 in drawn down federal AFI funds, the Agency either lacked nonfederal matching funds for or had used for non-AFI purposes approximately $435,000. The County informed HHS of this and HHS demanded the Agency return these funds. The Agency had approximately $117,000 left in the AFI reserve account and this amount was paid back to the federal government, leaving a remaining liability of approximately $317,000.

*Facts Relevant to Count 6 (Preparing False Documentary Evidence)*

Count 6 alleged Dillard prepared two ante-dated documents. The first related to reimbursed expenses. On August 26, 2010, Dillard paid for meals, drinks, and massages for herself and the Agency's deputy director at a local hotel and spa, and was subsequently reimbursed by the Agency for these expenses. On February 3, 2011, the day after she was placed on administrative leave, Dillard emailed her assistant asking for "copies of all my expenses that have been submitted." The following day, Dillard

---

[4] Dillard testified she believed this use of the funds was permissible as long as all of the money was returned when the AFI grant closed out, and she intended to return the funds so used to the Citibank AFI reserve account. As noted above, the jury acquitted appellants of improperly using AFI funds.

5

emailed her assistant a document purporting to be an "agenda" for an "ACAP Organizational Management" seminar held on August 26, 2010 at the hotel where the expenses had been incurred. Dillard's email asked her assistant to "[p]lease attach to expenses." Her assistant, who made all the arrangements for the hotel visit, had never seen the agenda before. The deputy director testified that several aspects of the agenda did not accurately represent what happened that day.

The second document related to an Agency program called CREW, which provided job training and employment to eligible participants living in the County. Dillard's nephew and his friend were participants in the CREW program but their June 2010 Agency paperwork stated they lived outside the County. In February 2011, the day after Dillard was placed on administrative leave, she emailed her assistant asking if she could "get a hold of the client files for [her nephew and his friend]? I would like to review them in order to prepare any defense I might need. [¶] Please do not hesitate if anything I request makes you uncomfortable." The following day, Dillard emailed her assistant memoranda dated June 16, 2010 stating Dillard's nephew and his friend were homeless but staying within the County. The email asked her assistant to "[p]lease file in client files," a reference to the CREW participant files.

Dillard admitted both documents were prepared after the fact and ante-dated, but claimed they were recreations of contemporaneously-prepared documents.

## DISCUSSION

### I. *Preemption*

Appellants argue the prosecutions of counts 2 and 3—theft by false pretenses and false accounting of public moneys, both based on the representation to HHS that the Agency had matching nonfederal funds in its AFI reserve account—were preempted by federal law. We agree.

#### A. *Legal Standard*

" 'The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law.' [Citations.] . . . Preemption is foremost a question of

6

congressional intent: did Congress, expressly or implicitly, seek to displace state law? [Citations.] [¶] We have identified several species of preemption. Congress may expressly preempt state law through an explicit preemption clause, or courts may imply preemption under the field, conflict, or obstacle preemption doctrines.[5] [Citations.] . . . The burden is on . . . the party asserting preemption[] to demonstrate [one of these species of preemption] applies." (*Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 307–308 (*Quesada*).)

Appellants do not identify any explicit preemption clause, nor do they contend conflict preemption—present "when simultaneous compliance with both state and federal directives is impossible" (*Viva!, supra,* 41 Cal.4th at p. 936)—applies. Appellants rely in part on field preemption, which "applies 'where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.' " (*Ibid.*) However, as will be shown below, the federal laws and regulations governing the AFI program are "not so complex or comprehensive that it may be inferred Congress intended to occupy the field." (*In re Jose C.* (2009) 45 Cal.4th 534, 553.)

We focus instead on appellants' obstacle preemption argument. "Obstacle preemption permits courts to strike state law that stands as 'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citations.] It requires proof Congress had particular purposes and objectives in mind, a demonstration that leaving state law in place would compromise those objectives, and reason to discount the possibility the Congress that enacted the legislation was aware of the background tapestry of state law and content to let that law remain as it was.

---

[5] " 'The categories of preemption are not "rigidly distinct." ' [Citations.] We and the United States Supreme Court have often identified only three species of preemption, grouping conflict preemption and obstacle preemption together in a single category. [Citations.] As conflict and obstacle preemption are analytically distinct and may rest on wholly different sources of constitutional authority, we treat them as separate categories here." (*Viva! Intern. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935–936, fn. 3 (*Viva!*).)

Ultimately, 'what constitutes a "sufficient obstacle [for a finding of implied preemption] is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." ' " (*Quesada, supra,* 62 Cal.4th at p. 312.)

One of the primary cases relied on by appellants is *Buckman Co. v. Plaintiffs' Leg. Com.* (2001) 531 U.S. 341 (*Buckman*). In *Buckman,* the plaintiffs claimed to be injured by a medical device and brought a state law tort lawsuit against a consultant to the device's manufacturer. (*Id.* at p. 343.) The plaintiffs claimed the consultant "made fraudulent representations to the Food and Drug Administration (FDA or Administration) in the course of obtaining approval to market the [devices]" and, "[h]ad the representations not been made, the FDA would not have approved the devices, and plaintiffs would not have been injured." (*Ibid.*)

The high court discussed the federal statutory scheme governing medical devices, set forth in the Federal Food, Drug, and Cosmetic Act (FDCA), 52 Stat. 1040, as amended by the Medical Device Amendments of 1976 (MDA), 90 Stat. 539, 21 United States Code section 301. (*Buckman, supra,* 531 U.S. at p. 344.) Devices which " 'presen[t] a potential unreasonable risk of illness or injury,' " like the one at issue in that case, "must complete a thorough review process with the FDA before they may be marketed." (*Ibid.*) However, "devices that were already on the market prior to the MDA's enactment in 1976" and any " 'substantially equivalent' " devices may seek an exception to this review process whereby they "remain available until the FDA initiates and completes the [review] process." (*Id.* at p. 345.) Manufacturers applying for this exception, referred to as the " '§ 510(k) process,' " must submit certain information to the FDA, including the intended use for the device. (*Ibid.*) The plaintiffs contended that the defendant's successful section 510(k) application fraudulently represented the intended use of the device. (*Id.* at pp. 346–347.)

*Buckman* first considered whether there was a presumption against preemption: "Policing fraud against federal agencies is hardly 'a field which the States have traditionally occupied' [citation], such as to warrant a presumption against finding federal pre-emption of a state-law cause of action. To the contrary, the relationship between a

8

federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law. [Citation.] Here, petitioner's dealings with the FDA were prompted by the MDA, and the very subject matter of petitioner's statements were dictated by that statute's provisions. Accordingly—and in contrast to situations implicating 'federalism concerns and the historic primacy of state regulation of matters of health and safety,' [citation]—no presumption against pre-emption obtains in this case." (*Buckman, supra,* 531 U.S. at pp. 347–348.)

*Buckman* concluded the plaintiffs' claims were preempted because "the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives. The balance sought by the Administration can be skewed by allowing fraud-on-the-FDA claims under state tort law." (*Id.* at p. 348.) The court highlighted the existence of statutory and regulatory "provisions aimed at detecting, deterring, and punishing false statements made during this and related approval processes. The FDA is empowered to investigate suspected fraud [citations], and citizens may report wrongdoing and petition the agency to take action [citation]. In addition to the general criminal proscription on making false statements to the Federal Government [citation], the FDA may respond to fraud by seeking injunctive relief [citation], and civil penalties [citation]; seizing the device [citation]; and pursuing criminal prosecutions [citation]. The FDA thus has at its disposal a variety of enforcement options that allow it to make a measured response to suspected fraud upon the Administration. [¶] This flexibility is a critical component of the statutory and regulatory framework under which the FDA pursues difficult (and often competing) objectives." (*Buckman, supra,* 531 U.S. at p. 349, fns. omitted.) For example, the FDA must "ensure both that medical devices are reasonably safe and effective and that, if the device qualifies under the § 510(k) exception, it is on the market within a relatively short period of time," and must "regulat[e] the marketing and distribution of medical devices

without intruding upon decisions statutorily committed to the discretion of health care professionals," such as the off-label use of a medical device. (*Id.* at pp. 349–350.)

The court continued: "State-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives. As a practical matter, complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants—burdens not contemplated by Congress in enacting the FDCA and the MDA. Would-be applicants may be discouraged from seeking § 510(k) approval of devices with potentially beneficial off-label uses for fear that such use might expose the manufacturer or its associates (such as petitioner) to unpredictable civil liability. . . . [¶] Conversely, fraud-on-the-FDA claims would also cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the Administration, will later be judged insufficient in state court. Applicants would then have an incentive to submit a deluge of information that the Administration neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application." (*Buckman, supra,* 531 U.S. at pp. 350–351.) The court emphasized the fact that the plaintiffs' "fraud claims exist solely by virtue of the FDCA disclosure requirements. . . . [¶] In sum, were plaintiffs to maintain their fraud-on-the-agency claims here, they would not be relying on traditional state tort law which had predated the federal enactments in questions. On the contrary, the existence of these federal enactments is a critical element in their case. For the reasons stated above, we think this sort of litigation would exert an extraneous pull on the scheme established by Congress, and it is therefore pre-empted by that scheme." (*Id.* at p. 353.)[6]

---

[6] Appellants also rely on two other United States Supreme Court cases. *Arizona v. U.S.* (2012) 567 U.S. 387 was a field preemption case. (*Id.* at p. 401.) The high court rejected the state's argument that the challenged law had "the same aim as federal law" because it "ignores the basic premise of field preemption—that States may not enter, in any respect, an area the Federal Government has reserved for itself." (*Id.* at p. 402.) The court also noted the argument was "unpersuasive on its own terms. Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework

*Quesada, supra,* 62 Cal.4th 298 is a contrasting case.  In *Quesada,* the plaintiff alleged the defendant was selling conventionally grown produce under an organic label, and brought state law false advertising and unfair competition claims.  (*Id.* at pp. 303–304.)  The defendant argued these state law claims were preempted by the federal Organic Foods Production Act of 1990 (7 U.S.C. §§ 6501–6522; Organic Foods Act).  (*Quesada,* at p. 304.)  As in *Buckman,* the *Quesada* court considered whether a presumption against preemption applied.  (*Quesada,* at pp. 312–314.)  The court noted "[t]he regulation of food labeling to protect the public is quintessentially a matter of longstanding local concern" and "the federal government has assumed a more peripheral role and routinely left undisturbed local policy judgments about how best to protect consumers."  (*Id.* at p. 313.)  "Consequently, the presumption against preemption 'applies with particular force' where state consumer protection laws regulating deceptive food labeling are at issue."  (*Id.* at p. 314.)

The California Supreme Court proceeded to consider the defendant's obstacle preemption argument.  The court highlighted the express purposes of the Organic Foods Act: " 'to establish national standards governing the marketing of' " organic food, " 'to assure consumers that organically produced products meet a consistent standard,' " and " 'to facilitate interstate commerce in' " organic food.  (*Quesada, supra,* 62 Cal.4th at p. 316.)  The court found that "permitting state consumer fraud actions would advance, not impair, these goals.  Substitution fraud, intentionally marketing products as organic

---

Congress adopted.  [Citations.]  Were [the state law] to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies."  (*Ibid.*)  *Wisconsin Dept. of Industry v. Gould Inc.* (1986) 475 U.S. 282, involved the National Labor Relations Act (NLRA), which "largely displaced state regulation of industrial relations."  (*Id.* at p. 286.)  The high court found a state law debarring repeat NLRA violators from state contracts "functions unambiguously as a supplemental sanction for violations of the NLRA," "conflicts with the [National Labor Relations] Board's comprehensive regulation of industrial relations," and "detracts from the 'integrated scheme of regulation' created by Congress."  (*Id.* at p. 288–289.)

that have been grown conventionally, undermines the assurances the USDA Organic label is intended to provide. Conversely, the prosecution of such fraud, whether by public prosecutors where resources and state laws permit, or through civil suits by individuals or groups of consumers, can only serve to deter mislabeling and enhance consumer confidence. [Citation.] From the grower perspective too, anything that deters the few bad apples, the 'dishonest traders looking to cash in on the premium prices organic food commands' [citation], enhances the overall health of the interstate market and benefits those producers that play by the rules in processing and marketing their products. Private claims like those here are thus consistent with the Organic Foods Act's goals of reassuring consumers and enabling fair competition." (*Id.* at pp. 316–317, fn. omitted.)

B. *AFI Legislation and Regulations*

We turn now to the federal statutory and regulatory scheme governing the AFI program. The Assets for Independence Act (hereafter, AFI Act or the Act) was enacted in 1998 and codified as a note to 42 United States Code section 604.[7] The express purpose of the Act is "to provide for the establishment of demonstration projects designed to determine-- [¶] (1) the social, civic, psychological, and economic effects of providing to individuals and families with limited means an incentive to accumulate assets by saving a portion of their earned income; [¶] (2) the extent to which an asset-based policy that promotes saving for postsecondary education, homeownership, and microenterprise development may be used to enable individuals and families with limited means to increase their economic self-sufficiency; and [¶] (3) the extent to which an asset-based policy stabilizes and improves families and the community in which the families live." (AFI Act, § 403.)

---

[7] (Pub. L. 105-285 (Oct. 27, 1998) 112 Stat. 2759, as amended by Pub. L. 106-554 (Dec. 21, 2000) 114 Stat. 2763; Pub. L. 107-110 (Jan. 8, 2002) 115 Stat. 1947; Pub. L. 114-95 (Dec. 10, 2015) 129 Stat. 2168.)

To this end, the Act authorizes HHS to approve demonstration projects designed to help low-income, low-net worth individuals accumulate assets for specified purposes, including postsecondary education and buying a home. (AFI Act, §§ 404, 405, 408.) The demonstration projects may be administered by nonprofit organizations, state or local government agencies, tribal governments, or certain credit unions and financial institutions. (*Id.*, § 404.)

For approved projects, the grantee "shall establish a Reserve Fund" and deposit in it "all funds . . . from any public or private source in connection with the demonstration project." (AFI Act, § 407(a), (b)(1)(A).)[8] HHS shall disburse the grants over the course of the five-year demonstration projects "in an amount not to exceed the lesser of-- [¶] (1) the aggregate amount of funds committed as matching contributions from non-Federal public or private sector sources; or [¶] (2) $1,000,000." (*Id.*, § 406(b).) Each dollar an individual deposits up to $2,000 shall be matched by between $0.50 and $4 of nonfederal funds and an equal amount of federal AFI grant funds. (*Id.*, § 410(a)–(b).) The Act sets forth detailed requirements for individual saver eligibility and qualified uses of the matched deposit account funds. (*Id.*, §§ 404, 408.)

The Act requires grantees to submit annual progress reports including the "number and characteristics" of individual savers, the amounts deposited and withdrawn, how configurations of the program and grantee organization impacted saver participation, and how the impact on participation varied among "different populations or communities." (AFI Act, § 412(a).) The Act further requires HHS to hire "an independent research organization to evaluate the demonstration projects conducted under [the Act], individually and as a group." (*Id.*, § 414(a).) The independent evaluation is to consider a number of factors including the demonstration projects' effects on savings behavior, savings rates, and rates of homeownership and postsecondary education, as well as the

---

[8] The Act excludes state and local government grantees from the requirement to establish a reserve fund. (AFI Act, § 407(a).) However, the Agency's AFI grant award obligated it to establish a reserve fund.

"economic, civic, psychological, and social effects of asset accumulation," and for all of these factors, how they vary among different populations or communities. (*Id.*, § 414(b)(1)–(4).) The evaluation must also consider "potential financial returns" to the federal government, and whether "a permanent program of individual development accounts should be established." (*Id.*, § 414(b)(5)–(6).)

The Act provides that grantees shall "have sole authority over the administration of the project. [HHS] may prescribe only such regulations or guidelines with respect to demonstration projects conducted under [the Act] as are necessary to ensure compliance with the approved applications and the requirements of [the Act]." (AFI Act, § 411.) However, this administrative authority is expressly subject to HHS's sanction authority set forth in the Act. (*Id.*, §§ 411, 413.) The Act provides that if HHS determines a grantee "is not operating a demonstration project in accordance with the entity's approved application . . . or the requirements of [the Act] (and has not implemented any corrective recommendations directed by [HHS]), [HHS] shall terminate such entity's authority to conduct the demonstration project," take control of the grantee's reserve fund, and attempt to identify another entity to take over the demonstration project. (*Id.,* § 413.)

HHS has other sanctions available for the failure to comply with requirements regarding the reserve funds. AFI regulations provide that grantee reserve funds must comply with HHS's uniform administrative requirements. (45 C.F.R. § 1000.3.) The regulations setting forth these administrative requirements provide: "If a non-Federal entity fails to comply with Federal statutes, regulations, or the terms and conditions of a Federal award, the HHS awarding agency . . . may impose additional conditions . . . . [or, if] noncompliance cannot be remedied by imposing additional conditions, the HHS awarding agency . . . may take one or more of the following actions, as appropriate in the circumstances: [¶] (a) Temporarily withhold cash payments . . . . [¶] (b) Disallow (that is, deny both use of funds and any applicable matching credit for) all or part of the cost of the activity or action not in compliance. [¶] (c) Wholly or partly suspend (suspension of award activities) or terminate the Federal award. [¶] (d) Initiate suspension or debarment

14

proceedings . . . . [¶] (e) Withhold further Federal awards for the project or program. [¶] (f) Take other remedies that may be legally available." (45 C.F.R. § 75.371.) One of the other legally available remedies for false representations to HHS is to seek federal criminal prosecution under 18 U.S.C. section 1001.[9]

C. *Presumption Against Preemption*

We turn first to whether the presumption against preemption applies in this case. As highlighted in *Buckman*, the inquiry is whether the state regulation occurs in " 'a field which the States have traditionally occupied.' " (*Buckman, supra,* 531 U.S. at p. 347.) The analysis hinges on how we characterize the area of regulation: is it the prosecution of theft and criminal fraud, which lies within the states' historic police powers, or is it "[p]olicing fraud against federal agencies . . . [,] hardly 'a field which the States have traditionally occupied' " (*Buckman,* at p. 347).

For purposes of the presumption against preemption, *Buckman* characterized state law tort claims as claims involving "[p]olicing fraud against federal agencies," where the defendant's "dealings with the FDA were prompted by [a federal statute], and the very subject matter of [the defendant's] statements were dictated by that statute's provisions." (*Buckman, supra,* 531 U.S. at pp. 347–348.) Similarly, appellants' dealings with HHS were prompted by the AFI Act, and the subject matter of the Citibank letter was dictated by that statute's provisions.

*Commonwealth's Motion to Appoint Counsel* (3d Cir. 2015) 790 F.3d 457 (*Commonwealth's Motion*) is also instructive. In that case, a nonprofit organization providing federal defender services was representing capital prisoners in state post-

_____

[9] With exceptions not relevant here, "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-- [¶] (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; [¶] (2) makes any materially false, fictitious, or fraudulent statement or representation; or [¶] (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; [¶] shall be fined under this title, imprisoned not more than 5 years . . . , or both." (18 U.S.C. § 1001.)

conviction review proceedings. (*Id.* at pp. 462–463.) In several such proceedings, the state attorney general asked the state Supreme Court to disqualify the federal defender organization from appearing absent federal court authorization. (*Id.* at pp. 463–464.) "[T]he cited reason for disqualification was based on the organization's alleged misuse of federal grant funds to appear in state proceedings," specifically, grant funds authorized by the Criminal Justice Act, 18 United States Code § 3006A, and administered by the Administrative Office of the United States Courts (AO). (*Commonwealth's Motion,* at pp. 461–462.) The state Supreme Court issued orders stating that, if federal grant funds were being used to fund the federal defender's appearance in the state proceedings, the federal defender should be disqualified. (*Id.* at pp. 464–465.)[10] The federal defender removed the disqualification motions to federal court and argued, inter alia, that federal law preempted the motions. (*Id.* at p. 461.)

The federal court of appeals considered whether the presumption against preemption applied. The state argued the authority for the removal was a state constitutional provision authorizing the state Supreme Court to prescribe rules governing the practice and procedure of the state courts. (*Commonwealth's Motion, supra,* 790 F.3d at p. 475.) The court of appeals reasoned: "As a general matter, it is true that the States have a long history of regulating the conduct of lawyers, who are officers of the courts. [Citation.] But the impetus for the proceedings here is that the Federal Community Defender is allegedly applying its federal grant funds to purposes not authorized by the relevant federal statutes and grant terms. [Citation.] As explained above, these grants are paid under the supervision of the AO, a federal agency within the Judicial Conference with regulatory control over the Federal Community Defender. '[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to

---

[10] The federal defender claimed only private funds were used for work on state proceedings, unless that work was preparatory for a federal proceeding. (*Commonwealth's Motion, supra,* 790 F.3d at p. 463.)

16

federal law.' [Citation.] Policing such relationships 'is hardly a field which the States have traditionally occupied,' and thus there can be no presumption against preemption here." (*Id.* at p. 476.)

We find this case akin to *Buckman* and *Commonwealth's Motion,* and unlike *Quesada.* In *Quesada,* the state laws "regulat[ed] deceptive food labeling," which the California Supreme Court found to be "quintessentially a matter of longstanding local concern." (*Quesada, supra,* 62 Cal.4th at pp. 313, 314.) Here, the sole basis for the prosecutions was appellants' representation to HHS about the AFI reserve account, made pursuant to and as required by the AFI Act. (See *Buckman, supra,* 531 U.S. at pp. 347–348.) The relationship between appellants and HHS "originates from, is governed by, and terminates according to federal law." (*Buckman,* at p. 347; *Commonwealth's Motion, supra,* 790 F.3d at p. 476.) Appellants' "dealings with [HHS] were prompted by the [AFI Act], and the very subject matter of [appellants'] statements were dictated by that statute's provisions." (See *Buckman,* at pp. 347–348.) Policing such a relationship is not an area of historic state regulation, accordingly, no presumption against preemption applies.

D. *Obstacle Preemption Analysis*

We now return to obstacle preemption and consider whether the prosecution of counts 2 and 3 is preempted by the AFI Act. As discussed in part I.B, *ante*, the purpose of the AFI Act was to establish asset-building demonstration projects and determine the various effects and impacts of asset-based policies. (AFI Act, § 403.) We conclude that permitting state criminal prosecutions based on grantees' representations to HHS made pursuant to the AFI Act would undermine these Congressional objectives.

The analysis in *Commonwealth's Motion,* finding preemption of the state's attempt to disqualify the federal public defender's office for violating the terms of its federal grant, is instructive. " 'Sanctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions [may] undermine[] the congressional calibration of force.' [Citation.] This is especially so when a federal agency is afforded the discretion to apply those sanctions or stay its hand. [Citations.] [¶]

17

Here, Congress has delegated supervisory authority over [Criminal Justice Act] grants to the AO. The AO has the power to 'reduce, suspend, or terminate, or disallow payments . . . as it deems appropriate' if the Federal Community Defender does not comply with the terms of its grants. [Citation.] But if the [state] could sanction noncompliance, the AO could be hindered in its ability to craft an appropriate response. . . . After all, as the District Court noted . . . , 'the [AO's] usual remedies, such as recoupment of distributed funds, are more consistent with the CJA's objectives because they mitigate the disruption to the existing attorney-client relationships.' [Citation.] Allowing the Commonwealth to attach consequences to the Federal Community Defender's relationship with the AO would 'exert an extraneous pull on the scheme established by Congress' in a manner that conflicts with federal objectives. *Buckman,* 531 U.S. at 353." (*Commonwealth's Motion, supra,* 790 F.3d at p. 477.) Similarly, the AFI Act provides that if a grantee is not operating its AFI project in compliance with the Act and its grant, HHS may recommend corrective measures and, if those are not implemented, terminate the project. (AFI Act, § 413(a).) HHS can take additional sanction measures, including debarment or recommending federal criminal prosecution. If states could initiate their own criminal prosecutions, HHS "could be hindered in its ability to craft an appropriate response." (*Commonwealth's Motion,* at p. 477.)

Significantly, the Act depends on grantees' interest in participating in the AFI program. The threat of state criminal prosecution could deter potential grantees from applying for an AFI grant. (See *Buckman, supra,* 531 U.S. at p. 350 ["Would-be applicants may be discouraged from seeking [FDA] approval of devices with potentially beneficial off-label uses for fear that such use might expose the manufacturer or its associates (such as petitioner) to unpredictable civil liability."].) We note that the HHS employees testified at trial that the process of applying for an AFI grant was "extensive," "not easy," and "takes resources of the agency." They testified the AFI program was difficult to administer and involved unique, confusing rules. The asset-building work of an AFI program "is not very easy. Even if you have the money, doing it is not that easy" and requires a lot of hard work.

18

We find it notable that the only sanction for noncompliance set forth in the AFI Act itself is termination of the grantee's authority to conduct the demonstration project. (AFI Act, § 413(a).)  It is also notable that the section of the Act setting forth sanctions includes detailed requirements that HHS attempt to identify another entity to operate the project and transfer the project to that entity.  (AFI Act, § 413(b)(1)–(5).)  This underscores Congress's purpose in enacting the AFI Act to conduct and support asset-building demonstration projects, and suggests Congress believed that punitive measures for noncompliance might often conflict with that purpose.[11]

Indeed, HHS's response to grantee noncompliance has conformed to this understanding.  HHS employee Yeoman testified that when HHS becomes aware of problems with a grantee's administration of an AFI grant, "generally speaking, we sort of take the position of go and sin no more.  That is, okay, you screwed up. . . . Here's how you need to do it.  Do it right from now on. . . . [¶] We don't want to stop a program and stop the individuals from getting the benefit of it if we can find another way to get it right."  If AFI grant money had been spent inappropriately, Yeoman testified, "[w]e would first figure out can we, can we make this right?  It might, it might involve the grantee paying back funds, paying back money, into the grant from some other source . . . ."  Morgan similarly testified that if HHS learned a grantee drew down federal AFI grant money without matching nonfederal funds on deposit, "we would try our best to work with the grantee to help them be successful in correcting such a problem without having to do some disciplinary action.  So, we would probably try and we would, you know, talk to our legal counsel, again, in the office of general counsel for HHS, and try to work it out with them, if we could," although "once a grant project period is over, . . . it really would be difficult to pursue any type of correction to that type of thing without a

---

[11] The People argue that state theft prosecutions "can deter misuse of federal funds" and thus further the purpose of the AFI Act, but appellants were acquitted of misusing the AFI funds.  The challenged prosecutions were based solely on appellants' misrepresentations to HHS.

disallowance." While this testimony is not indicative of Congress's intent at the time the AFI Act was enacted, it lends supports to our assessment of that intent.

This obstacle—the potential of the state law to deter applicants critical to the federal law's purpose—was entirely absent in *Quesada,* where the California Supreme Court found that "permitting state consumer fraud actions would advance, not impair" the goals of federal statutes. (*Quesada, supra,* 62 Cal.4th at p. 316 [establishing national marketing standards for organic food and increase consumer confidence in organically-labeled food].)

The People cite several cases rejecting preemption challenges to state criminal prosecutions for fraud against the federal government. We find these cases distinguishable. Three involve prosecutions based on the defendants' theft of federal benefits. (*State v. Jones* (Utah Ct.App. 1998) 958 P.2d 938, 939 [federal disability retirement benefits]; *People v. Lewis* (Ill.App.Ct. 1998) 693 N.E.2d 916, 917 [federal unemployment benefits for railroad employees]; *Commonwealth v. Morris* (Pa.Super.Ct. 1990) 575 A.2d 582, 583 [Social Security benefit checks].) The cases describe no Congressional purpose that would be hindered by state prosecutions. (*Jones,* at p. 943 [the defendant "concedes that the State's prosecution creates no actual conflict with the administration of [the federal law]"]; *Lewis,* at p. 920 ["we are confident that the State's prosecution of defendant for theft of federal unemployment benefits does not operate as an impediment to Congress's purposes and objectives in prohibiting benefits fraud"]; *Morris,* at p. 586 ["We conclude that the Social Security Act itself as well as its legislative history make clear that the federal government did not intend to dominate the field of public welfare to the exclusion of the states."].) Similarly, in a fourth case involving a state prosecution for forgery of federal income tax documents, "the defendant has not pointed to any actual conflict with federal law." (*State v. Radzvilowicz* (Conn.App.Ct. 1997) 703 A.2d 767, 788.)

In the two remaining cases relied on by the People, the defendants argued their state prosecutions were preempted by federal criminal statutes penalizing the same conduct. (*Carter v. Commonwealth* (Va.Ct.App. 1997) 492 S.E.2d 480, 480–481

20

[defendant convicted of cable television fraud; federal statute criminalized unauthorized reception of cable television service]; *State v. McMurry* (Ariz.Ct.App. 1995) 909 P.2d 1084, 1085–1086 [defendant convicted of forgery for possessing counterfeit $20 bills; federal statute criminalized possession of counterfeit tender].)  Again, there was no indication of a Congressional purpose that would be hindered by the state prosecution; to the contrary, in both cases an express savings clause preserved the states' authority. (*Carter,* at pp. 481–482 [savings clause encompassed state laws " 'regarding the unauthorized interception or reception of any cable service,' " and the state law "stands not as an obstacle to the accomplishment and execution of the full objectives of Congress, but as a supplement"]; *McMurry,* at p. 1086 ["Nothing in the federal statutes regarding counterfeiting . . . indicates, much less expresses, an intent by the federal government to legislatively occupy the field as to the punishment of those who possess counterfeit tender, with an intent to defraud.  In fact, 18 [United States Code section] 3231 declares a contrary intent by stating that '[n]othing in this title [18] shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof.' "].)

Finally, the People rely on remarks by the bill's author that the bill "recognizes the limits of government and the fact that many of our worst social problems will never be solved by government alone."  (Remarks of Sen. Coats, 144 Cong. Rec. S11868 (Oct. 8, 1998).)  The People argue this indicates Congress's intent to delegate responsibility to the local level and "permits no implication" that state prosecutions of grantees could be preempted.  However, the remark was not limited to the federal government, and appears to be directed at local government as well.  Moreover, the sentence quoted by the People was immediately followed by: "We are beginning to recognize that there are people and institutions, families, churches, synagogues, parishes, community volunteer organizations, faith-based charities, that are able to communicate societal ideals and restore individual hope, and we need to allow those organizations to compete to provide services, and we have done so in each of the programs I have described."  (*Ibid.*)  The full statement thus underscores a Congressional understanding that the success of the AFI Act

21

depends on the willingness of organizations and entities to apply for AFI grants and become grantee organizations. The threat of state criminal prosecution could significantly dampen this willingness, thereby posing an obstacle to the objectives of the AFI Act. (See *Buckman, supra,* 531 U.S. at p. 350.)[12]

We conclude the prosecutions of counts 2 and 3 were preempted by federal law. We emphasize the narrowness of our holding, which is limited to state law liability for grantees' representations to HHS made pursuant to the AFI Act. This holding does not extend to criminal liability for conduct by savers participating in the AFI program. It also does not include theft prosecutions where an employee of the grantee took the federal AFI funds for their own personal use (a circumstance not alleged here), as such a prosecution would not arise from the relationship between the grantee and HHS as governed by federal law.

E. *Forfeiture of Preemption Claim as to Count 3*

Finally, we turn to the People's argument that appellants forfeited their preemption claim as to count 3. Appellants concede they raised this argument in the trial court only as to counts 1 and 2, but contend preemption is not forfeitable.

We need not decide whether appellants' preemption argument can be forfeited because we exercise our discretion to excuse any forfeiture. The issue is one of law and does not involve any disputed facts. (*People v. Rosas* (2010) 191 Cal.App.4th 107, 115 ["appellate courts regularly use their discretion to entertain issues not raised at the trial level when those issues involve only questions of law based on undisputed facts" (italics omitted)].) Moreover, the People were not prejudiced by any forfeiture: appellants preserved the identical claim as to other counts and the People point to no difference in

---

[12] The People also point to the AFI Act's section entitled "Local Control Over Demonstration Projects" (AFI Act, § 411), and argue it would be "incongruous to mandate local control but preclude local response to malfeasance." However, the local control referred to in the Act is the control of grantee organizations—not local government—and is expressly subject to HHS's sanction authority provided for in the Act. (AFI Act, § 411 ["A qualified entity [grantee] . . . shall, subject to the [sanctions provision of the Act], have sole authority over the administration of the project."].)

the analysis involving count 3.  (See *People v. Yeoman* (2003) 31 Cal.4th 93, 118 ["[T]o consider the [forfeited] claim entails no unfairness to the parties, who had an opportunity to litigate the relevant facts and to apply the relevant legal standard in the trial court [on a properly raised and effectively identical claim].  Nor does it impose any additional burden on us, as the reviewing court." (fn. omitted)].)  Accordingly, we excuse any forfeiture on this issue as to count 3.

F.  *Conclusion*

In sum, we find the prosecution of counts 2 and 3 preempted by federal law.  We will reverse the convictions on those counts.  This conclusion renders moot a number of appellants' additional arguments, which we need not and do not resolve.  However, it does not impact Dillard's conviction on count 6, preparing false documentary evidence, and we consider Dillard's remaining arguments relevant to that count.

II.  *Conflict of Interest*

Appellants argue the trial court erred in denying their motion asserting the district attorney's office had a conflict of interest.  We affirm.

A.  *Background*

In October 2011, the County submitted a claim under its crime insurance policy with AIG for the Agency's remaining liability to HHS of approximately $317,000 in AFI funds.

In February 2012, the Alameda County District Attorney filed criminal charges against appellants.  At the November 2012 preliminary hearing, one of the witnesses was the interim executive director of the Agency appointed to oversee its dissolution after appellants' termination.  During cross-examination, the witness testified that the County had filed a claim with its crime insurance policy for the AFI funds.

In March 2013, AIG sent a letter to the County with a "preliminary assessment" of the claim.  The letter stated "it does not appear likely that the County will be able to establish that it has incurred an actual net loss covered under [the relevant policies] resulting directly from the alleged acts of Ms. Dillard.  Any payment which the County might be required to make to the Federal Government is a return of funds to which it was

23

not otherwise entitled and thus . . . . an indirect loss, not covered under these insuring agreements." In addition, "our investigation thus far do[es] not show that [the Agency] suffered an actual net loss with respect to the use of the grant funds. . . . [T]he funds in question were used to fund the ongoing operations of [the Agency]. . . . Such losses are in the nature of bookkeeping losses that do not otherwise result in an actual net diminution of assets of the insured" and "accordingly are not generally covered under the [applicable policy]." AIG underscored, however, that it "has not reached a final conclusion" as to coverage. The People did not produce this letter to appellants.

In September 2013, counsel for Daniels sent a letter to the People asking for discovery of "[the Agency's] crime insurance policy and all documents related to any claims made on that policy." The People again did not produce the March 2013 AIG letter, subsequently representing they did not possess it, but appellants apparently obtained it through a third-party subpoena on the Agency's custodian of records (one of the constituent cities). Appellants claimed they did not receive the letter until after the start of trial, although before the presentation of evidence.

After the jury was sworn but before the presentation of evidence, Daniels filed a motion, later joined by Dillard, seeking dismissal of the charges due to prosecutorial misconduct of failing to produce the AIG letter.[13] Appellants argued the People intentionally failed to disclose the letter because it "demonstrates an unavoidable conflict of interest for the District Attorney," namely, that because the claim is still pending, the County "is trying this criminal case on a contingency basis . . . ." Although the AIG letter itself makes no reference to the then-pending criminal charges, Daniels's trial counsel represented that he spoke to an AIG representative who stated AIG was awaiting the outcome of the criminal trial. The motion continued: "Had defense counsel been timely provided with documentation demonstrating this obvious financial conflict of

_____

[13] Appellants also argued the People's failure to disclose the AIG letter constituted a *Brady* violation because the letter was exculpatory. (*Brady v. Maryland* (1963) 373 U.S. 83.) They do not pursue this challenge on appeal.

interest, they would have filed a motion to recuse the district attorney in this case under [section] 1424 . . . . Due to the concealment of that information, however, it is impossible to substitute in new counsel after the start of trial." The motion cited no authority for the assertion that filing the recusal motion was now "impossible."

At the hearing on the motion, the trial court began by summarizing appellants' argument: "had the insurance records been timely provided, that they might well have demonstrated a conflict of interest on the part of the District Attorney, which would have grounded a motion pursuant to [section] 1424, to recuse, but which at this late date cannot be brought because I think basically jeopardy has already attached." Appellants agreed with this statement of the issue. Following argument, the trial court denied the motion to dismiss "for the reasons implied by my questioning in court." The court's questioning indicated its skepticism that the letter demonstrated a conflict of interest rendering it unlikely appellants would receive a fair trial.

B. *Legal Standard*

"[D]ismissal is an appropriate sanction for government misconduct that is egregious enough to prejudice a defendant's constitutional rights." (*People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, 446 (*Velasco-Palacios*).) Here, appellants argued below the alleged prosecutorial misconduct prevented them from filing a timely section 1424 motion to disqualify the district attorney. The trial court's denial appears to have rested on a conclusion that any section 1424 motion would not have been successful.

Section 1424 provides that a motion to disqualify a district attorney "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." "The statute demands a showing of a real, not merely apparent, potential for unfair treatment, and further requires that that potential 'rise to the level of a *likelihood* of unfairness.' [Citation.] Although the statute refers to a 'fair trial,' we have recognized that many of the prosecutor's critical discretionary choices are made before or after trial and have hence interpreted section 1424 as requiring recusal on a showing of a conflict of interest ' "so grave as to render it unlikely that defendant will receive fair treatment *during all portions of the criminal*

25

*proceedings*." ' [Citation.] [¶] On review of the trial court's denial of a recusal motion, '[o]ur role is to determine whether there is substantial evidence to support the [trial court's factual] findings [citation], and, based on those findings, whether the trial court abused its discretion in denying the motion.' " (*People v. Vasquez* (2006) 39 Cal.4th 47, 56 (*Vasquez*).)

C. *Analysis*

As an initial matter, appellants' argument on appeal suggests their motion below was a "recusal motion" which the trial court denied because it was untimely. Appellants argue this denial was in error because there is no time limit for filing a recusal motion. In fact, as set forth above, appellants filed a motion to *dismiss* in which *they* asserted that a disqualification motion would be untimely. The People argue appellants' failure to accurately characterize the proceedings below or to present appellate argument on prosecutorial misconduct (as opposed to conflict of interest) forfeits this issue. We need not decide whether any forfeiture occurred because, as we explain below, we affirm the trial court's ruling.

First, assuming (without deciding) the People's failure to produce the AIG letter was misconduct, appellants' argument on appeal refutes their claim of prejudice below. In the trial court, appellants argued they were prejudiced because the People's failure to provide the letter sooner precluded appellants from filing a timely section 1424 motion. On appeal, appellants argue there are no time limits in which such a motion must be filed. Because, according to appellants' own argument (on which we express no opinion), they were *not* precluded from filing a section 1424 motion after receiving the AIG letter, any prosecutorial misconduct in failing to provide the letter earlier did not cause prejudice.

Second, assuming that a section 1424 motion would have been untimely and that appellants have not forfeited this claim, dismissal is only appropriate if any prosecutorial misconduct prejudices appellants' constitutional rights. (See *Velasco-Palacios, supra,* 235 Cal.App.4th at p. 446.) The only prejudice relied on by appellants below was their purported inability to file a section 1424 motion to disqualify the district attorney. However, an inability to file a section 1424 motion—even assuming the motion would

26

have been granted—does not alone constitute a violation of constitutional rights. "[T]rial courts' statutory power under section 1424 . . . allow[s] recusal whenever a conflict creates a *likelihood* of unfair treatment. This standard serves to prevent potential constitutional violations from occurring. Thus, the failure to recuse when required under section 1424 may lead to the denial of a fair trial or other unfair treatment, but does not necessarily do so." (*Vasquez, supra,* 39 Cal.4th at p. 59.)

Finally, the trial court did not abuse its discretion in concluding that a section 1424 motion based on the AIG letter would be unsuccessful.[14] We note that the original charges against appellants were brought more than a year before the AIG letter issued and therefore any conflict of interest resulting from the letter could not exist at that time. Although, as appellants note, conflicts of interest can cause unfairness in other phases of criminal proceedings, appellants fail to identify any unfairness other than the fact of the prosecution itself, nor do they identify any changes in the prosecution's approach taking place after the letter issued. Moreover, it is unclear how the prosecution would impact AIG's coverage decision in light of the People's concession that they were not alleging appellants used AFI funds for their own personal use. Most significantly, appellants fail to provide authority that the potential for a criminal conviction to financially impact a *county* renders that county's *district attorney's office* conflicted. Cases involving the direct financial interest of a district attorney's office are inapposite. (See *County of Santa Clara v. Superior Court* (2010) 50 Cal.4th 35, 51 ["giving a public prosecutor a direct pecuniary interest in the outcome of a case that he or she is prosecuting 'would render it unlikely that the defendant would receive a fair trial' "]; *People v. Eubanks* (1996) 14 Cal.4th 580, 595–596 ["a scheme that provides monetary rewards to a prosecutorial office might carry the potential impermissibly to skew a prosecutor's exercise of the charging and plea bargaining functions"]; *Eubanks,* at p. 598 [conflict of interest present

---

[14] Appellants contend our review is de novo because the trial court's ruling was based on a legal error, to wit, that the recusal motion was untimely. As explained above, we reject this characterization of the basis for the trial court's ruling.

27

where corporate crime victim paid a " 'substantial' " debt incurred by the district attorney in investigating the case].)  Although a district attorney's budget may be impacted by a county's overall financial health, appellant cites no authority that such an attenuated impact can render it unlikely that a defendant will receive a fair trial.  We affirm the trial court's denial of appellants' motion to dismiss.[15]

III. *Vindictive and Retributive Prosecution*

Appellants next argue the trial court erred by refusing to let them "submit evidence and argument to convince the jury that the prosecution was vindictive and retributive," in violation of their right to due process and a fair trial.  We disagree.

During in limine motions, the People sought to exclude evidence of (1) the County's insurance claim, and (2) a lawsuit brought by Dillard against the County alleging her termination proceedings violated public meetings laws, and the parties' subsequent settlement.  The People argued such evidence was irrelevant or, to the extent there was some relevance, should be excluded pursuant to Evidence Code section 352.  The trial court denied the motion, finding both sets of evidence relevant "to establish bias, interest or motive of at least one or some of the witnesses."  However, during argument on the motion, the court noted appellants "are alleging[] a discriminatory prosecution motion in the guise of what you wish to bring in front of a jury."

During trial, the court permitted testimony that Dillard sued the County, claiming her termination violated the Brown Act; that the lawsuit settled and pursuant to that settlement the County paid Dillard $219,000 plus $100,000 in attorney fees; that the County filed a claim for approximately $318,000 on its crime insurance policy based on HHS's disallowance of AFI funds; that AIG issued a "soft denial" of the claim; and that the Agency's member municipalities had not yet paid back the disallowed AFI funds because the repayment was "pending insurance claims."  However, the court excluded

---

[15] Appellants also rely on evidence elicited at trial that they claim shows the district attorney "commenced this prosecution at the behest of Ms. Dillard's political enemies." This was not the basis of appellants' dismissal motion below and we decline to consider it.

28

under Evidence Code section 352 the settlement agreement for Dillard's termination lawsuit and the County's insurance claim form.[16] The court also sustained prosecution objections to statements during closing arguments about the civil settlement agreement and the People's motives in prosecuting the case. The court instructed the jury, in the course of sustaining these objections, that "the purpose of [evidence about the County's crime insurance claim] is for you to assess any bias that witnesses might have because of that outstanding crime insurance policy and for no other reason," and "[t]he reason why cases are filed are not a matter for your consideration."

Appellants argue the trial court's rulings violated their constitutional right to present evidence in their defense. Appellants' "attempt to inflate garden-variety evidentiary questions into constitutional ones is unpersuasive. 'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." ' " (*People v. Boyette* (2002) 29 Cal.4th 381, 427–428.) Appellants also claim a violation of their right to present closing argument. "It is firmly established that a criminal defendant has a constitutional right to have counsel present closing argument to the trier of fact. [Citations.] Nonetheless, it is equally settled that a judge in a criminal case 'must be and is given great latitude in controlling the duration and limiting the scope of closing summations.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1184.)

The trial court did not abuse its discretion in excluding evidence and limiting argument. "To be relevant, evidence must have some 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid.Code, § 210.)" (*People v. Contreras* (2013) 58 Cal.4th 123, 152.) Appellants argue the evidence was relevant to show the prosecution's motive in pursuing criminal charges. "[E]vidence of a prosecutor's subjective motivations when prosecuting a case is

---

[16] Although appellants claim the trial court also excluded the March 2013 AIG letter, the provided record cite does not support this claim. Because the March 2013 AIG letter does not appear on appellants' exhibit list, it appears appellants did not seek admission of this document at trial.

29

not relevant . . . ." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1329.) Appellants argue *Seumanu* involved a claim of prosecutorial vouching and is therefore inapplicable. We disagree. A prosecutor's subjective motivation is not relevant to any issue before the jury, regardless of which side tries to use it to their advantage.

Appellants contend prosecutorial motive is relevant for claims of vindictive or retaliatory prosecution, but such claims are properly argued to the court, not the jury—the basis for the claim is that vindictive prosecutions violate a defendant's constitutional rights, not that they constitute evidence of innocence. (See *People v. Valli* (2010) 187 Cal.App.4th 786, 802 ["The gravamen of a vindictive prosecution is the increase in charges or a new prosecution brought in retaliation for the exercise of constitutional rights. [Citation.] It is 'patently unconstitutional' to 'chill the assertion of constitutional rights by penalizing those who choose to exercise them.' "].) To the extent evidence regarding Dillard's lawsuit and the County's insurance claim were relevant to the jury's assessment of a witness's credibility, the court permitted the evidence and argument. In sum, the challenged rulings regarding evidence and argument were proper and did not violate appellants' constitutional rights.

IV. *Substantial Evidence (Count 6)*

Finally, Dillard argues the guilty verdict on count 6 (preparing false documentary evidence; § 134) lacks substantial evidence. We disagree.

Section 134 prohibits "preparing any false or antedated book, paper, record, instrument in writing, or other matter or thing, with intent to produce it, or allow it to be produced for any fraudulent or deceitful purpose, as genuine or true, upon any trial, proceeding, or inquiry whatever, authorized by law . . . ." Dillard concedes there is substantial evidence that she prepared two ante-dated documents: the agenda for the hotel meeting and the memorandum regarding the residential status of two CREW members. She argues there is no substantial evidence that she prepared either document with the intent that it be produced for any proceeding authorized by law or that she intended their production for a fraudulent or deceitful purpose.

30

First, Dillard prepared the ante-dated documents within two days after she was placed on administrative leave. Second, she asked her former assistant to place the ante-dated documents in the Agency's files. Third, when she asked her former assistant to send her the files regarding the CREW employees, she expressly stated her intent to "review them in order to prepare any defense I might need." This evidence, taken together, provides substantial evidence that Dillard prepared the documents with the intent that they be used in some proceeding involving her performance while employed at the Agency. That they were never so used is immaterial: "There is no requirement that the evidence actually be produced at all, only that the defendant intended it to be produced at any trial, proceeding, or inquiry, whatever, authorized by law." (*People v. Morrison* (2011) 191 Cal.App.4th 1551, 1556.)

As Dillard argues, the contemplated proceeding must be "authorized by law." (See *People v. Clark* (1977) 72 Cal.App.3d 80, 83–84 [administrative grievance board proceedings instituted pursuant to the Education Code are a " 'proceeding . . . authorized by law' " for purposes of § 134].) In closing arguments, the prosecution identified as possible proceedings a civil lawsuit filed by Dillard challenging any adverse employment action,[17] an investigation by the Board, and an audit. Dillard does not dispute that civil litigation challenging adverse employment action is a proceeding authorized by law, but argues the ante-dated documents were not relevant to the action she ultimately filed. Again, that the documents were not ultimately used is immaterial; there was substantial evidence for the jury to find that Dillard intended their use at the time she prepared them. With respect to an investigation or audit by the Board, Dillard argues there is no evidence such an inquiry was authorized by law or the Agency's by-laws. To the contrary, the

---

[17] We reject Dillard's suggestion that the prosecutor committed misconduct by suggesting during rebuttal argument that the documents were intended for use in Dillard's civil suit against the County. Dillard failed to object to the statement and has therefore forfeited the argument. (*People v. Bonilla* (2007) 41 Cal.4th 313, 336 ["To preserve a claim of prosecutorial misconduct during argument, a defendant must contemporaneously object and seek a jury admonition."].)

Agency's joint powers agreement admitted into evidence at trial provides for an annual audit conducted by a certified public accountant "[p]ursuant to Section 6505 of the California Government Code . . . ." Government Code section 6505, subdivision (b), requires "an annual audit of the accounts and records of every agency or entity" created by a joint powers agreement. Such a proceeding is thus authorized by law.

Finally, the ante-dating of the documents provides substantial evidence that Dillard intended they be used for a fraudulent or deceitful purpose, namely, as documents purporting to record contemporaneous events. Substantial evidence supports the jury verdict on count 6.

## DISPOSITION

Appellants' convictions on counts 2 and 3 are reversed. The matter is remanded to the trial court for resentencing. The judgments are otherwise affirmed.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.

(A141998)

Superior Court of Alameda County, Nos. CH-53179A & CH-53179B, Hon. Allan Hymer, Judge.

John Doyle, under appointment by the Court of Appeal, for Defendant and Appellant Paul Daniels.

Violet Elizabeth Grayson, for Defendant and Appellant Nanette Sheree Dillard.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, René A. Chacón and J. Michael Chamberlain, Deputy Attorneys General, for Plaintiff and Respondent.